KENNECOTT CORPORATION, Petitioner,

v.

The UTAH STATE TAX COMMISSION and Salt Lake County, Respondents.

No. 920144.

Supreme Court of Utah.

Aug. 27, 1993.

---

James B. Lee, Maxwell A. Miller, Kent Winterholler, Salt Lake City, for Kennecott.

R. Paul Van Dam, Atty. Gen., Joseph T. Dunbeck, Jr., Asst. Atty. Gen., Salt Lake City, for Tax Com'n, David E. Yocum, Karl L. Hendrickson, Bill Thomas Peters, Salt Lake City, for County.

HALL, Chief Justice:

Kennecott Corporation ("Kennecott") petitions this court to review a Utah State Tax Commission ("Commission") decision whereby the Commission determined the 1988 assessed value of Kennecott's real and personal property. We affirm.

Kennecott's primary business is mining. It owns real property, improvements, and personal property located in Salt Lake County. Kennecott's mining properties are subject to central assessment by the property tax division ("Division") of the Commission.

The Division originally assessed the value of Kennecott's centrally taxable property as of January 1, 1988, at $635,570,036. Later, the Commission approved a reduction in the assessed value of that property to $617,771,020. On May 10, 1990, a hearing was held at which Kennecott sought a further reduction in the assessed value of its property. Kennecott took the position that the assessed value of its real property should be reduced by 20 percent pursuant to Utah Code Ann. § 59–2–304 or, in the alternative, that the assessed value of all of Kennecott's property should be reduced by 14 percent, the same percentage by which the value of state-assessed taxable railroad property was reduced for 1988. On March 3, 1992, the Commission issued a final decision ruling that Kennecott was not entitled to a reduction in the assessed value of its property and that it was proper to assess Kennecott's property at 100 percent of its fair market value of $617,771,-020. Kennecott then petitioned this court for a writ of review.

The issues on appeal are (1) whether the Commission correctly concluded that Kennecott is not entitled to a 20 percent reduction in the assessed value of its real property and (2) whether the Commission correctly concluded that Kennecott is not entitled to a 14 percent reduction in the assessed value of all its property.

1. Utah Code Ann. §§ 63–46b–1 to –22.

2. *See* Utah Code Ann. § 63–46b–16(4)(d); *Savage Indus. Inc. v. Utah State Tax Comm'n*, 811 P.2d 664, 669 (Utah 1991).

3. The 1988 version of section 59–2–304 (Supp. 1988), which governs this case, provides in pertinent part:
 (1) If the county assessor uses the comparable sales or cost appraisal method in determining the fair market value of taxable property for assessment purposes, the assessor is required to recognize that various fees, services, closing costs, and other expenses related to the transaction lessen the actual amount that may be received in the transaction. The county assessor shall, therefore, take 80% of the value based on comparable sales or cost appraisal of the property as its fair market value.

4. Article XIII, section 2(1) of the Utah Constitution states:

Because Kennecott seeks relief from the Commission's determination, the Utah Administrative Procedures Act ("UAPA")[1] governs this court's review of that determination. When reviewing an agency's interpretation of law, this court reviews the agency's decision for correctness.[2]

■ Kennecott challenges the Commission's determination, maintaining that it is entitled to a 20 percent reduction in the assessed value of its real property. Kennecott points to Utah Code Ann. § 59–2–304, which allows property assessed by a county to be assessed at 80 percent of its fair market value.[3] Kennecott contends that although its property is centrally assessed and section 59–2–304 plainly applies only to county-assessed properties, the statute should apply to its property as well, thus reducing the assessed value by 20 percent. Kennecott argues that failure to apply section 59–2–304 to its property violates the uniform and equal requirements of sections 2 and 3, article XIII of the Utah Constitution[4] and the equal protection requirements of both the United States and Utah Constitutions.[5]

■ Kennecott therefore challenges section 59–2–304 as unconstitutional in its application to Kennecott. When reviewing

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law. Article XIII, section 3(1) of the Utah Constitution reads in part:
 The Legislature shall provide by law a uniform and equal rate of assessment on all tangible property in the state, according to its value in money, except as otherwise provided in Section 2 of this Article. The Legislature shall prescribe by law such provisions as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property....

5. *See* U.S. Const. amend. XIV; Utah Const. art. I, § 24.

the Commission's conclusions as to the legality or constitutionality of tax statutes, we afford no deference because they are conclusions of law and are therefore reviewed for correctness.[6] The party attacking the constitutionality of a statute has the burden of affirmatively demonstrating that the statute is unconstitutional.[7] Moreover, there is a strong presumption that tax statutes are constitutional.[8]

To support its claim, Kennecott relies on this court's decision in *Amax Magnesium Corp. v. Utah State Tax Commission.*[9] In *Amax,* we held that Utah Code Ann. § 59–5–4.5 [10] was unconstitutional as applied to Amax and that Amax was therefore entitled to the 20 percent reduction in the value of its state-assessed property.[11] The Commission assessed the value of Amax's real property and improvements at 100 percent of their fair market value. Amax contended that its state-assessed property should be assessed at 80 percent of its reasonable fair cash value, the same taxable value at which the county would assess. Amax charged that requiring the state to assess property at 100 percent of its value while allowing the county to assess property at 80 percent of its value was not constitutionally permissible.

We held that applying section 59–5–4.5 to county-assessed properties and not to Amax's property was unconstitutional because the state used the same valuation method to assess Amax's property as the county would have used.[12] Because the very purpose of section 59–5–4.5 was to allow for a 20 percent reduction where an overvaluation of property had occurred due to certain methods of valuation, we reasoned that the anticipated overvaluation would occur regardless of which entity performed the valuation. Thus, it would be an unconstitutional violation of the uniformity and equality requirements of article XIII, sections 2 and 3 to apply section 59–5–4.5 to county-assessed properties and not to state-assessed properties where the same method of valuation was employed.[13]

Additionally, we found that section 59–5–4.5 had created two classes of property assessed by the same method and had arbitrarily discriminated against one solely because it was a state-assessed property. Because there was no reasonable basis for classification and no reasonable relationship between the classification and the purpose of the statute, we held that section 59–5–4.5, as applied to Amax, violated article I, section 24 of the Utah Constitution.[14]

Thus, based on *Amax,* the disposition of whether Kennecott is entitled to the 20 percent reduction under section 59–2–304 turns on whether the Division used the same valuation method to assess Kennecott's property as the County would have used. The Commission concluded that Kennecott did not show that its property was valued according to the same method the County used in assessing county-assessed properties and is therefore not entitled to the 20 percent reduction in the assessed value of its real property. The Commission found that (1) the Division val-

**6.** *Questar Pipeline Co. v. Utah State Tax Comm'n,* 817 P.2d 316, 317–18 (Utah 1991); *SEMECO Indus., Inc. v. Auditing Div.,* 849 P.2d 1167, 1171 (Utah 1993) (Durham, J., dissenting).

**7.** *Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 191 (Utah 1984).

**8.** *Id.*

**9.** 796 P.2d 1256 (Utah 1990).

**10.** The statute at issue in *Amax,* section 59–5–4.5 (Supp.1986) (repealed), allowed county assessors to assess property at 80 percent of its rea-

sonable fair cash value. The amended version of section 59–5–4.5 is found at Utah Code Ann. § 59–2–304.

**11.** *Id.* at 1262. In *Rio Algom,* however, we held section 59–5–4.5 to be constitutional on its face. 681 P.2d at 194.

**12.** *Id.* at 1260.

**13.** *Id.* at 1260–61.

**14.** *Id.* at 1262.

ued Kennecott's property according to the capitalized net revenue method pursuant to Utah Code Ann. § 59-2-201(2),[15] (2) the capitalized net revenue method is exclusive to the assessment of mining properties and is the *only* method by which Utah mining properties are valued, and (3) that the County uses a combination of the comparable sales method, the cost appraisal method, and the income method to assess commercial and industrial real properties.

 Kennecott contends that the Commission erred in finding both that the Division valued Kennecott's property according to the capitalized net revenue method and that Kennecott did not show that its property was valued by the same method used by the County. When the Commission's action is based upon a determination of fact, this court reviews the whole record to determine whether the Commission's action was supported by substantial evidence.[16] We consider both the evidence supporting the Commission's factual findings and the evidence that detracts from those findings.[17] Because Kennecott's challenge to the Commission's decision is based on the factual findings, Kennecott bears the burden of marshaling all of the evidence supporting the findings and then, despite the supporting facts, showing that the findings are not supported by substantial evidence.[18]

Kennecott argues that the Commission's factual determinations are unsupported by substantial evidence in the record. According to Kennecott, the evidence at the hearing established that the capitalized net revenue method was not used to value its property and that the valuation method used to value its property was identical to the valuation methods the County used. Thus, Kennecott maintains that under *Amax*, it is entitled to the 20 percent reduction in the assessed value of its property.

To support its assertion that the capitalized net revenue method was not used, Kennecott first points to the fact that section 59-2-201(2) provides that aside from the capitalized net revenue method, the Commission may value mining properties according to "any other valuation method the commission believes, or the taxpayer demonstrates to the commission's satisfaction, to be reasonably determinative of the fair market value of the mining property." [19] Kennecott then turns to Brent Eyre's testimony at the hearing.[20] Eyre testified that when Kennecott's property was valued in 1988, Kennecott was concluding a modernization project and that when valued according to the capitalized net revenue method, the value of Kennecott's property was less than the summation of the value of the land, improvements, and tangible property. Therefore, he stated that according to the requirement of section 59-2-201(2) that the property's value not be less that the summation of the value of land, improvements, and personal prop-

---

15. Utah Code Ann. § 59-2-201(2) (Supp.1987) states:

 (2) The method for determining the fair market value of productive mining property is the capitalized net revenue method or any other valuation method the commission believes, or the taxpayer demonstrates to the commission's satisfaction, to be reasonably determinative of the fair market value of the mining property. The rate of capitalization applicable to mines shall be determined by the commission, consistent with a fair rate of return expected by an investor in light of that industry's current market, financial, and economic conditions. In no event may the fair market value of the mining property be less than the fair market value of the land, improvements, and tangible personal property upon or appurtenant to the mining property.

16. Utah Code Ann. § 63–46b–16(4)(g); *First Nat'l Bank of Boston v. Salt Lake County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990); *SEMECO*, 849 P.2d at 1172–73 (Durham, J., dissenting).

17. *First Nat'l Bank*, 799 P.2d at 1165.

18. *Id.*

19. Utah Code Ann. § 59-2-201(2).

20. Eyre is assistant director of the Property Tax Division of the Utah State Tax Commission. He oversees the valuation of centrally assessed properties in Utah for property tax purposes.

erty,[21] the "valuation placed on Kennecott's property was the summation of physical assets." Kennecott concludes that to arrive at a summation, it was then necessary to use certain valuation methods to ascribe separate values to land, improvements, and tangible property. Specifically, according to testimony at the hearing, the comparable sales method was used to value the land and the cost method was used to value the improvements. Based on this, Kennecott claims that the Division did not use the capitalized net revenue method to value its property.

Kennecott then claims that the Division used the same valuation method the County would use to value Kennecott's property. Kennecott identifies the three methods used by both the Division and the County to value real property as the replacement cost less depreciation method, the comparable sales method, and the income method. Because the Division and the County employ the same three methods to value property and the Division used both the cost method and the comparable sales method in valuing separately Kennecott's land and improvements to arrive at a summation, Kennecott deduces that the Division used the same method to value Kennecott's property in 1988 as the County would have used.

We first address the Commission's finding that the Division used the capitalized net revenue method to value Kennecott's property. When asked which approach was used to reach a value for Kennecott's property, Eyre responded that the capitalized net revenue approach was used, as mandated by section 59–2–201(2). And because the value reached using the capitalized net revenue method was less than the summation of the value of the land, improvements, and tangible property, the value placed on Kennecott's property was the summation of physical assets, also mandated by section 59–2–201(2). While it is true

that the ultimate value placed on Kennecott's property was the summation of physical assets, this does not lead to the conclusion that the capitalized net revenue method was not used to value Kennecott's property. To the contrary, a review of the record reveals substantial evidence to support the Commission's finding that the Division used the capitalized net revenue method.

We now determine whether the Commission was correct in finding that Kennecott failed to show that the valuation method the Division used to value Kennecott's property and the methods the County used to value similar properties were the same. The record reveals that the Division and the County use primarily three methods when valuing commercial and industrial property: the replacement cost minus depreciation method, also referred to as the cost approach; the comparable sales method, also known as the market approach; and the income approach. However, the record also reveals that while these methods are referred to by the same or similar names, they differ significantly in their application. For example, the Division, when valuing Kennecott's property according to the capitalized net revenue method, an income approach, allows a five-year "carry forward" for unused capital investments so that income for future years can be reduced. Larry Butterfield, chief appraiser of the Salt Lake County Assessor's office, testified that the County, on the other hand, in applying an income approach, does not use a carry forward of capital investments. Testimony at the hearing also revealed that when valuing property under the comparable sales method, the Division does not place a value on the mineral content of real property, while the County does.

In addition to the differences in the application of these standard methods, the record does not suggest specifically which of

**21.** Section 59–2–201(2) states, "In no event may the fair market value of the mining property be less than the fair market value of the land, improvements, and tangible personal property upon or appurtenant to the mining property."

these methods the County would use to value Kennecott's property. Kennecott identifies these three methods but has not provided any insight into specifically which method the County would use to value its property.

Based on the above, we conclude that there is substantial evidence to support the Commission's finding that Kennecott has not shown that the Division and the County used the same methods to value Kennecott's property. Accordingly, section 59–2–304, as applied to Kennecott, does not violate the uniform and equal requirements of sections 2 and 3, article XIII of the Utah Constitution or the equal protection requirements of the Utah and United States Constitutions. Thus, we hold that Kennecott is not entitled to a 20 percent reduction in the assessed value of its centrally assessed real property.

■ We now address whether the Commission was correct in denying Kennecott a 14 percent reduction in the assessed value of all of its centrally assessed property. Kennecott challenges the Commission's determination, claiming that failure to allow it the 14 percent reduction while affording it to state-assessed railroads for 1988 is unconstitutional.

To support its claim, Kennecott points to *Union Pacific Railroad v. State Tax Commission of Utah*.[22] *Union Pacific* involved three railroads that challenged property tax assessments on the ground that the assessments violated the Railroad Revitalization and Regulatory Reform Act of 1976 ("the 4R Act"), which prohibits state and local taxing authorities from discrimi-

nating against railroad properties. Specifically, section 306 of the 4R Act[23] prohibits a state from assessing railroad properties at a value that has a higher ratio to true market value than the ratio of the value of other commercial and·industrial properties to true market value. The railroads claimed that Utah discriminated against them by overvaluing their properties and by denying them the 20 percent reduction given to locally assessed commercial and industrial properties. The court compared the ratio of assessed value to true market value for both the railroad properties and other commercial properties and determined the ratio of assessed value to true market value for the railroad properties to be higher.[24] Accordingly, the district court held that Utah had discriminated against the railroads, thus violating the 4R Act, and ordered the assessed value of the railroad properties reduced.[25]

Kennecott then points to the fact that in spite of the requirement that all centrally assessed properties be assessed at 100 percent of their fair market value, in 1988, the Commission assessed all real and personal property of state-assessed railroads at 86 percent of their fair market value pursuant to the *Union Pacific* decision.[26] Kennecott argues that while not protected under the 4R Act, it is entitled to the same relief afforded the railroads and that denying it the 14 percent reduction is a violation of both the Utah and United States Constitutions.

Specifically, Kennecott argues that denying the 14 percent reduction violates the uniform operation of laws requirement of article I, section 24 of the Utah Constitu-

22. 716 F.Supp. 543 (D.Utah 1988).

23. 49 U.S.C. § 11503.

24. *Union Pacific,* 716 F.Supp. at 566.

25. *Id.*

26. The *Union Pacific* decision reduced the assessed value of the railroads' properties for the

1984 and 1985 tax years. For subsequent years, the Commission followed the formula used by the *Union Pacific* court to equalize the railroads' assessment ratio with the ratio of assessed value to true market value for all commercial and industrial properties in Utah. For 1988, the 4R Act required that the assessed value of the railroads' properties be reduced by 14 percent.

tion [27] by treating the railroads differently than Kennecott. Kennecott relies on *Blue Cross & Blue Shield v. State*,[28] where we stated that article I, section 24 prohibits "classifying persons in such a manner that those who are similarly situated with respect to the purpose of a law are treated differently by that law, to the detriment of some of those so classified." [29] According to Kennecott, it and the railroads are similarly situated on the sole basis that they are both centrally assessed taxpayers according to section 59–2–201(1). Under section 59–2–201(1), the Commission is required to assess all centrally assessed properties at 100 percent of their fair market value.[30] Kennecott maintains that because its property is assessed at 100 percent of its value while the railroads' properties are assessed at 86 percent of their value, similarly situated taxpayers are being classified and treated differently with respect to section 59–2–201(1). Therefore, according to Kennecott, section 59–2–201(1) as applied to it unconstitutionally violates article I, section 24. Kennecott additionally ar-

gues that the Commission's determination violates the federal equal protection clause [31] because it intentionally and systematically undervalued centrally assessed railroad properties while assessing Kennecott's centrally assessed property at full value.[32]

To establish a violation of the uniform operation of laws requirement of the Utah Constitution with regard to taxation, "a party must demonstrate that a law creates certain classes of persons" [33] derived from those "who are similarly situated with respect to the purpose of a law." [34] The party challenging the law must then show that "the law is applied differently to each classification without a reasonably related legitimate government purpose." [35] Kennecott has not shown that it meets the standard under article I, section 24.

While both Kennecott and the railroads are centrally assessed, this appears to be the only similarity. The 4R Act sets the railroads apart from Kennecott as taxpayers. While Kennecott does not seek relief

**27.** Article I, section 24 of the Utah Constitution states, "All laws of a general nature shall have uniform operation."

**28.** 779 P.2d 634 (Utah 1989).

**29.** *Id.* at 637 (citing *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988)).

**30.** Utah Code Ann. § 59–2–201(1) (Supp.1987) states in part:

(1) By May 1 the following property shall be assessed by the commission at 100% of fair market value, as valued on January 1, in accordance with this chapter:
(a) all property which operates as a unit across county lines, if the values must be apportioned among more than one county or state;
 . . .;
(c) all mines and mining claims and other valuable mineral deposits;
(d) all machinery used in mining, all property or surface improvements upon or appurtenant to mines or mining claims, and the value of any surface use made of mining claims or mining property for other than mining purposes. For the purposes of assessment and taxation, all processing plants, mills, reduction works, and smelters which are pri-

marily used by the owner of a mine or mining claim for processing, reducing, or smelting minerals taken from a mine or mining claim, shall be considered appurtenant to that mine or mining claim, regardless of actual location[.]

**31.** U.S. Const. amend. XIV, § 1.

**32.** See *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), where the United States Supreme Court held that tax assessment practices by which recently purchased real properties which were taxed at significantly higher rates than property that had not been recently sold violated the equal protection clause of the Fourteenth Amendment. The Court reasoned that the tax assessments were unconstitutional because the property that had not been recently sold had been intentionally and systematically undervalued. *Id.* at 345–46, 109 S.Ct. at 638–39.

**33.** *Amax*, 796 P.2d at 1261.

**34.** *Blue Cross & Blue Shield*, 779 P.2d at 637 (citing *Mountain Fuel*, 752 P.2d at 888).

**35.** *Amax*, 796 P.2d at 1261.

under the 4R Act, the Act remains a distinguishing factor for purposes of determining whether the railroads and Kennecott are similarly situated taxpayers. The 4R Act protects only the railroads and applies to the railroads specifically as taxpayers by prohibiting taxing authorities from discriminating against railroad properties.

Also among the differences between Kennecott and the railroads as taxpayers is the fact that the Division values Kennecott's property according to an entirely different method than it uses to value railroad properties. In *Amax,* we held that the statute in question violated article I, section 24 because it created two classes of property assessed by the same method and arbitrarily discriminated against one.[36] This case presents us with a different scenario. As noted above, in 1988, the Division valued Kennecott's property as well as all other mining properties according to the capitalized net revenue method pursuant to section 59–2–201(2). The Commission found that for that same year, centrally assessed railroads were valued by a combination of the cost appraisal method, the income approach, and the stock and debt approach. Furthermore, these methods, while similar in name to the standard methods used to value commercial and industrial properties, differ significantly in their application when valuing railroad properties.

 Kennecott does not claim that the methods used to value its property and the railroad properties were the same, nor does it dispute the Commission's findings that the methods were not the same. It does, however, assert that the Commission "overemphasized" the differences in valuation methods used to value Kennecott's and the railroads' properties. According to Kennecott, for purposes of determining whether discrimination has occurred, the valuation method used to arrive at a property's value is not important; how a property is taxed once a value is ascertained is important. We disagree. The methods by which properties are valued are crucial for determining whether taxpayers are similarly situated. We conclude that because Kennecott's and the railroads' centrally assessed properties were valued according to different methods, Kennecott and the railroads are not similarly situated taxpayers.

In short, while section 59–2–201(1) may be applied differently to Kennecott than it is to the railroads by valuing Kennecott's property at 100 percent of its value while valuing the railroads' properties at only 86 percent of their value, Kennecott has failed to meet its burden of first demonstrating that section 59–2–201(1) has created classifications of similarly situated taxpayers. Thus, section 59–2–201(1) does not violate the uniform operation of laws provision of the Utah Constitution or the equal protection requirements of the United States Constitution.[37] We therefore hold that Kennecott is not entitled to a 14 percent reduction in the assessed value of its property for 1988. The Commission's decision is affirmed.

HOWE, Associate C.J., and DURHAM, STEWART and ZIMMERMAN, JJ., concur.

---

**36.** *Id.* at 1262.

**37.** Because we have determined that section 59–2–201(1) as applied to Kennecott does not violate article I, section 24 of the Utah Constitution, it is not necessary to address Kennecott's claim that the federal equal protection clause has been violated. In *Blue Cross,* we stated, "[I]f the statutes under attack can withstand scrutiny under article I, section 24, they will not be found to violate the federal equal protection clause." 779 P.2d at 637.