Mark and Roselyn MARYBOY,
Petitioners,

v.

UTAH STATE TAX COMMISSION, Auditing Division of the State Tax Commission, and the State of Utah, Respondents.

No. 930173.

Supreme Court of Utah.

Sept. 14, 1995.

Bill Thomas Peters, David W. Scofield, Salt Lake City, for petitioners.

Jan Graham, Atty. Gen., Brian L. Tarbet, Asst. Atty. Gen., Salt Lake City, for respondents.

Herb Yazzie, Joe Lennihan, Window Rock, for amicus Navajo Nation.

STEWART, Associate Chief Justice:

Petitioners Mark and Roselyn Maryboy appeal a decision of the Utah State Tax Commission assessing Utah income tax on their earnings as a county commissioner and a state employee, respectively, during the years 1988 through 1990. The Maryboys also appeal the Commission's decision requiring them to pay $10,855.38 in taxes, penalties, and interest prior to pursuing this appeal.

The Maryboys are enrolled members of the Navajo Tribe and at all relevant times lived in Montezuma Creek, Utah, on the Navajo Reservation ("the Reservation"). Mr. Maryboy is employed as a San Juan County Commissioner and was elected by voters in district three of San Juan County, a political subdivision of the State of Utah. Nearly ninety-nine percent of district three lies within the Reservation. Approximately ninety percent of the voters in district three are Navajo, but not all of these Navajos live on the Reservation. Mr. Maryboy is paid by San Juan County.

During the years in question, Mr. Maryboy spent much of his time as a county commissioner working on the Reservation. Mr. Maryboy's responsibilities included coordinating with the Navajo Nation county programs dealing with such matters as public safety and natural resources; meeting with the six Navajo governmental units, known as chapters, located within district three; consulting with constituents; and performing other county commission duties. Because he speaks Navajo, Mr. Maryboy also assisted the county commissioner in district two and met with the two Navajo chapters located on the Reservation within district two boundaries.

Mr. Maryboy was also employed as the Division Director of the Utah Navajo Development Counsel (UNDC) during the years in question. As a division director, Mr. Maryboy supervised education and teen pregnancy programs on the Reservation. Although UNDC headquarters was located off the Reservation in Bluff, Utah, Mr. Maryboy spent a large percentage of his time as a division director working on the Reservation. Mr. Maryboy was paid from UNDC funds which were derived from the Utah Navajo Trust Fund.

Mrs. Maryboy is employed by San Juan Mental Health of the Utah Department of Human Services to provide mental health services and outpatient counseling to Utah Navajos living on the Reservation. She works out of the state office located at Montezuma Creek, Utah, and also sees clients in her home. During the years in question, Mrs. Maryboy performed approximately eighty percent of her duties on the Reservation.

Mrs. Maryboy's duties off the Reservation included attending staff meetings one day a week at the main office in Blanding, Utah. She also received clinical training and updated her records there. In addition, Mrs. Maryboy worked off the Reservation at Bluff School once a month and at San Juan High School once a year.

The Commission's Auditing Division determined that all income earned by the Maryboys during the years 1988 through 1990, except Mr. Maryboy's income as a director of the UNDC, was fully taxable in Utah. The Maryboys appealed the determination, and a hearing was held before the Commission. The Commission ruled that Mrs. Maryboy's income as a state employee and Mr. Maryboy's income as a county commissioner were fully taxable to Utah. The Maryboys appealed.

On a motion for summary disposition, this Court remanded for the Commission to determine whether the Maryboys were required to pay the assessed taxes, penalties, and interest as provided by Utah Code Ann. § 59-1-505 prior to pursuing their appeal. The Commission held a formal hearing and ruled that the Maryboys were required to deposit the deficiency to pursue their appeal. The Maryboys now challenge both the Commission's determination of their Utah income tax liability and the Commission's decision that they were required to pay $10,855.38 in taxes, penalties, and interest as a condition of pursuing this appeal.

## I. STATE INCOME TAX

We first address the Maryboys' contention that the Commission erred in ruling that Mr. Maryboy's income from employment as a county commissioner and Mrs. Maryboy's income from her state employment is taxable. This issue presents a question of law. Accordingly, we grant the Commission no deference but apply a correction-of-error standard. Utah Code Ann. § 59–1–610(1)(b) (Supp.1994); *Fatt v. Utah State Tax Comm'n,* 884 P.2d 1233, 1234 (Utah 1994).

The Maryboys assert that *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), controls the issue of the taxability of their incomes. In *McClanahan,* the Court held that Arizona could not impose its personal income tax on "reservation Indians with income derived wholly from reservation sources." 411 U.S. at 165. The Maryboys argue that under *McClanahan,* Utah has no authority to tax income they earned from on-Reservation activities. The Maryboys also rely on *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), which held that the gross receipts of a tribally operated ski resort located outside the boundaries of a reservation were subject to state taxation. The Court explained that when tribal members go beyond the boundaries of the reservation, they have "generally been subject to nondiscriminatory state law otherwise applicable to all citizens of the state." *Id.* at 148–49, 93 S.Ct. at 1270–71. The Maryboys assert that *McClanahan* and *Mescalero* require that their income tax liability be tailored to include only that portion of their income received for activities that occurred outside the Reservation boundaries.

The Commission contends that *McClanahan* does not preclude taxation of the Maryboys' income because *McClanahan* did not deal with " 'Indians who have left ... reservations ... [but] involve[d] the narrow question whether the State may tax a reservation Indian for income earned exclusively on the reservation' " (quoting *McClanahan,* 411 U.S. at 167–68, 93 S.Ct. at 1259–60 (citations omitted)). Citing *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980), the Com-

mission argues that the validity of the tax turns on whether the imposition of the tax infringes tribal sovereignty and whether the right of the state to tax the governmentally paid salaries of the Maryboys is preempted by federal law. The Commission asserts that the tax does not interfere with tribal sovereignty, i.e., the right of the Navajo Nation to make its own laws, because the State of Utah merely seeks to tax its own elected officials and employees. The Commission also argues that the tax is not preempted by federal law because no federal law expressly precludes states from taxing their own elected officials and employees and because Native Americans who go " 'beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the state' " (quoting *Mescalero,* 411 U.S. at 148–49, 93 S.Ct. at 1270–71).

The United States Supreme Court has stated that "there is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." *White Mountain,* 448 U.S. at 142, 100 S.Ct. at 2583. The semi-independent status of tribes and Congress' broad power to regulate tribal affairs create "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Id.*

First, federal law may preempt the exercise of state authority. In this context, standards of preemption that have emerged in other areas of the law are not appropriate. *White Mountain,* 448 U.S. at 143, 100 S.Ct. at 2583; *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 184, 109 S.Ct. 1698, 1711–12, 104 L.Ed.2d 209 (1989). "Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other." *White Mountain,* 448 U.S. at 143, 100 S.Ct. at 2583. The concept of Indian sovereignty, which traditionally barred the extension of state law to reservations, must guide a preemption determination. It "provides a backdrop against which the applicable treaties and statutes must be read." *McClanahan,* 411 U.S. at 168, 172, 93

S.Ct. at 1260, 1262; *White Mountain,* 448 U.S. at 143, 100 S.Ct. at 2583. Ambiguities in treaties and federal statutes are to be construed generously in light of the firm federal policy of promoting tribal self-sufficiency and economic development. *White Mountain,* 448 U.S. at 143–44, 100 S.Ct. at 2583–84; *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); *McClanahan,* 411 U.S. at 174, 93 S.Ct. at 1263. Thus, an express congressional statement preempting a state's assertion of authority is not required; state action may be preempted solely by reason of federal policies and interests. *White Mountain,* 448 U.S. at 144, 100 S.Ct. at 2584.

■■■ Nevertheless, state regulatory interests must also be given weight. *Id.; McClanahan,* 411 U.S. at 171, 93 S.Ct. at 1261–62. Even on reservations, state law may be applied unless its application would interfere with tribal self-government or impair a right granted or reserved by federal law. *Mescalero,* 411 U.S. at 148, 93 S.Ct. at 1270; *see California v. Cabazon Band,* 480 U.S. 202, 214–15, 107 S.Ct. 1083, 1091–92, 94 L.Ed.2d 244 (1987). " 'Under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and . . . in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members.' " *Cabazon Band,* 480 U.S. at 214–15, 107 S.Ct. at 1090–91 (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331–32, 103 S.Ct. 2378, 2384–85, 76 L.Ed.2d 611 (1983)). It follows that a preemption analysis requires "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *White Mountain,* 448 U.S. at 145, 100 S.Ct. at 2584; *see Cotton Petroleum,* 490 U.S. at 184, 109 S.Ct. at 1711–12; *Ramah Navajo School Bd. v. Bureau of Revenue,* 458 U.S. 832, 837, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 156–57, 100 S.Ct. 2069, 2082–83, 65 L.Ed.2d 10 (1980).

■■■ The second barrier to the exercise of state authority is that such authority "may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' " *White Mountain,* 448 U.S. at 142, 100 S.Ct. at 2583 (citations omitted) (quoting *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251 (1959)). Where "both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions," the principles of tribal self-government were "designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected." *McClanahan,* 411 U.S. at 179, 93 S.Ct. at 1266; *see Williams,* 358 U.S. at 220, 79 S.Ct. at 270–71; *White Mountain,* 448 U.S. at 142, 100 S.Ct. at 2583. This analysis is "grounded in notions of inherent sovereignty and in congressional policies, [and] seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Colville,* 447 U.S. at 156, 100 S.Ct. at 2083. On this analysis, on-reservation activity involving only tribal members is generally exempt from state law. *Id.* at 156–67, 100 S.Ct. at 2082–88; *see, e.g., McClanahan,* 411 U.S. at 179–80, 93 S.Ct. at 1266–67; *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 480, 96 S.Ct. at 1644–45 (1976). When state taxation is at issue, tribal interests are strongest when a tax is based on value derived from on-reservation conduct involving only tribal members and where the taxpayer is the recipient of tribal services. *Colville,* 447 U.S. at 156–67, 100 S.Ct. at 2082–88; *see Moe,* 425 U.S. at 475–81, 96 S.Ct. at 1642. On the other hand, a state tax is generally valid when the tax is directed at value generated off the reservation and the taxpayer is the recipient of a state's services. *Colville,* 447 U.S. at 156–62, 100 S.Ct. at 2082–86. In those circumstances, the state interest is at its strongest and the burden on the tribe is likely to be minimal. *Id.; see, e.g., Cotton Petroleum,* 490 U.S. at 184–91, 109 S.Ct. at 1711–12.

While protection of the interests of tribal self-government alone can be a sufficient bar to a state's exercise of authority on the reser-

vation, it is related to the preemption analysis because the "right of tribal self-government is ultimately dependent on and subject to the broad power of Congress." *White Mountain*, 448 U.S. at 143, 100 S.Ct. at 2583. Thus, when assessing the validity of a state tax, the Supreme Court has generally focused on a preemption analysis with the principles of tribal self-government acting as a backdrop. For example, in *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 175–77, 109 S.Ct. 1698, 1706–08, 104 L.Ed.2d 209 (1989), the Court held that federal law did not preempt state oil and gas severance taxes imposed on a non-Indian lessee producing oil from on-reservation wells. In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 151, 155–59, 100 S.Ct. 2069, 2071, 2082–84, 65 L.Ed.2d 10 (1980), the Court held that a state cigarette sales tax imposed on sales by tribal members to nontribal members was not preempted by a tax imposed by the tribal government. The Court explained that the state's interest in taxing nontribal member purchasers outweighed any tribal interest in preventing the tax. *Id.* In *Ramah Navajo School Board v. Bureau of Revenue*, 458 U.S. 832, 838–43, 102 S.Ct. 3394, 3398–3401, 73 L.Ed.2d 1174 (1982), the Court held that a comprehensive federal regulatory scheme governing construction of autonomous Indian educational facilities preempted the state's authority to impose gross-receipts tax on the non-Indian contractor. In *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 150, 100 S.Ct. 2578, 2587, 65 L.Ed.2d 665 (1980), the Court held that a use fuel tax imposed on a nontribal logging company that was working on the reservation was preempted by (1) a comprehensive federal scheme, (2) the fact that the tax burden ultimately fell on the tribe, and (3) the state's inability to justify taxes except in terms of a generalized interest in revenue. In *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 480–81, 96 S.Ct. 1634, 1644–45, 48 L.Ed.2d 96 (1976), the Court held that personal property taxes could not be applied to tribal members who resided on the reservation because the taxes conflicted with applicable federal statutes.

■ Despite the flexible and particularized analysis reflected in the above cases, the Maryboys assert that *McClanahan* creates a per se rule against taxing Native Americans who reside on the reservation and derive their income from activities that take place on the reservation. We disagree. In *McClanahan*, the Court employed a preemption analysis to determine whether the relevant treaties and statutes allowed Arizona's exertion of authority over Mrs. McClanahan. 411 U.S. at 172–79, 93 S.Ct. at 1262–66. The Court held that they did not and that Arizona had exceeded its lawful authority by attempting to tax McClanahan. *Id.* at 173, 93 S.Ct. at 1263. "Since appellant is an Indian and since her income is derived wholly from reservation sources, her activity is totally within the sphere which the relevant treaty and statutes leave for the Federal Government and for the Indians themselves." *Id.* at 179–80, 93 S.Ct. at 1266–67. In *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 146, 93 S.Ct. 1267, 1269, 36 L.Ed.2d 114 (1973), the Court summarized the *McClanahan* holding:

> [I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and [*McClanahan*], lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent.

411 U.S. at 148, 93 S.Ct. at 1270 (citations omitted). *County of Yakima v. Yakima Nation*, 502 U.S. 251, 258, 112 S.Ct. 683, 688, 116 L.Ed.2d 687 (1992), also held that a state was without power to tax reservation Indians absent cession of jurisdiction or a federal statute making congressional intention to authorize state taxation unmistakably clear. Although these cases could be construed to have erected a per se rule against state taxation in such circumstances,[1] the *McCla-*

---

1. In *California v. Cabazon Band*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), which addressed the validity of state regulations of on-reservation bingo games, the Court stated in a footnote, "In the special area of state taxation of Indian tribes and tribal members, we have adopted a per se rule." *Id.* at 216 n. 17, 107 S.Ct. at 1092 n. 17.

*nahan* rule provides only a beginning point for our analysis because we must in addition conduct a "particularized inquiry into the nature of the state, federal, and tribal interests at stake," *see White Mountain,* 448 U.S. at 145, 100 S.Ct. at 2584, to determine whether the state taxing authority can be asserted under the circumstances. Thus, as the Court has recently stated, *McClanahan* establishes a "presumption against state taxing authority" which "counsels against finding [state] jurisdiction" to tax Native Americans residing on the reservation or in Indian country. *Oklahoma Tax Comm'n v. Sac & Fox Nation,* —— U.S. ——, —— - ——, 113 S.Ct. 1985, 1991–92, 124 L.Ed.2d 30 (1993). In *Sac & Fox Nation,* the Court addressed whether a tribal member who does not live on a formal reservation is exempt from state income taxes under *McClanahan.* The Court explained, "The residence of a tribal member is a significant component of the *McClanahan* presumption against state tax jurisdiction." *Id.* at —— - ——, 113 S.Ct. at 1990–91. The Court held that it was enough for a tribal member to live in "Indian Country" and that the tribal member need not live on a formal reservation to be entitled to the benefit of the *McClanahan* presumption. *Id.* at —— - ——, 113 S.Ct. at 1991–92.

In this case, the federal interests are similar to those in *McClanahan.* As amicus curiae Navajo Nation points out, the federal laws at issue are substantially the same. First, the Navajo Treaty of 1868 "set apart" the Reservation "for the use and occupation of the Navajo tribe." 15 Stat. 667, 668 (1868); *McClanahan,* 411 U.S. at 174, 93 S.Ct. at 1263. Second, the Utah Enabling Act provided that Utah would "forever disclaim all rights and title ... to all lands lying within said limits owned or held by any Indian or Indian tribes." 28 Stat. 107, 108 (1894). Citing similar language in the Arizona Enabling Act, the *McClanahan* Court stated that it illustrated that "Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation." *McClanahan,* 411

U.S. at 175, 93 S.Ct. at 1264 (citing *Williams,* 358 U.S. at 220–21, 79 S.Ct. at 270–71).

Many of the tribal interests involved here also are similar to those in *McClanahan.* The Maryboys are enrolled members of the Navajo Tribe and live on the Reservation. Accordingly, *McClanahan* counsels against finding state authority to tax their on-Reservation income. *See Sac & Fox Nation,* —— U.S. at —— - ——, 113 S.Ct. at 1991–92.

Nevertheless, "[t]his is not a case in which the State has had nothing to do with the on-reservation activity, save tax it. Nor is this a case in which an unusually large state tax has imposed a substantial burden on the Tribe." *Cotton Petroleum,* 490 U.S. at 186, 109 S.Ct. at 1713. In this case, unlike *McClanahan,* "both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions." *McClanahan,* 411 U.S. at 179, 93 S.Ct. at 1266. We must therefore analyze the relevant state interests involved to determine whether the state's interests overcome the *McClanahan* presumption against state taxing jurisdiction.

The state's interest in Mrs. Maryboy's income as a therapist for San Juan Mental Health is not sufficiently different from Arizona's interest in *McClanahan* to overcome the presumption.[2] Utah clearly has an interest in the mental health services it provides to the Navajos on the Reservation and can fairly be said to have jurisdiction over those it employs to furnish these services. However, the services the state provides are much like those provided by the private sector, and Mrs. Maryboy's employment as a therapist is not unlike a therapist's position in a private mental health clinic. Her employment activity on the Reservation depends entirely on the need or desire of Reservation Navajos for mental health services. This is a value derived from on-reservation conduct involving only tribal members. Under *McClanahan,* the state would be precluded from taxing this type of activity in the private sector, because it would be "totally within the sphere which the relevant treaty and statutes leave for the Federal Government and for

---

**2.** Although the Court in *McClanahan* did not state the nature of McClanahan's employment, counsel at oral argument asserted that she worked at the on-reservation branch of an off-reservation, nontribal bank.

the Indians themselves." 411 U.S. at 179–80, 93 S.Ct. at 1266–67. We are unpersuaded that the state's interest in providing mental health services to the Reservation is sufficient to overcome this presumption. We hold that the state's attempt to tax Mrs. Maryboy's income violates federal law.

■ In addition, although Mrs. Maryboy participates in administrative and training activities off the Reservation, these activities do not alter her employment so as to take her "beyond the boundaries of the reservation" and subject her to "nondiscriminatory state law otherwise applicable to all citizens." *Mescalero*, 411 U.S. at 148–49, 93 S.Ct. at 1270–71. Mrs. Maryboy was hired to provide mental health services to Navajos living on the Reservation. Her administrative and training activities are merely incidental to her duty to provide counseling to Reservation Navajos. Thus, we reject the argument that her income must be apportioned on the basis of the percentage of time she spends on work activities outside the Reservation boundaries. Accordingly, we hold that the Commission erred in assessing Utah income tax on Mrs. Maryboy's income as a therapist for San Juan Mental Health.

■ The state interests relevant to Mr. Maryboy's income as a commissioner for San Juan County present different considerations. The state's interest could not be more compelling than when it involves a publicly elected official acting in his capacity as a representative of the state and performing a state function. Whether Mr. Maryboy is working on or off the Reservation, when he is functioning as a county commissioner he is representing the citizens of San Juan County. As county commissioner, he coordinates county programs with the tribal government, including public safety, natural resources, education, and health programs, coordinates and matches county funds with tribal programs to provide services for Navajo county residents, and participates in county administrative and policy-making decisions. All of his commissioner activities are necessarily for the benefit of San Juan County and affect the lives of the citizens of San Juan County, whether or not they are Reservation Navajos.

In addition, although he is elected by the constituents of district three, Mr. Maryboy's duties and policy-making power have countywide effect; his votes as a county commissioner carry the same weight as the votes cast by the other two county commissioners elected to serve San Juan County. Clearly, with respect to Mr. Maryboy's income as a county commissioner, the state has a paramount interest in the activity it seeks to tax quite apart from its general interest in raising revenues; "[t]his is not a case in which the State has had nothing to do with the on-reservation activity, save tax it." *Cotton Petroleum*, 490 U.S. at 186, 109 S.Ct. at 1713.

Likewise, allowing the state to tax elected officials of state subdivisions who work on the Reservation does not create a substantial burden on the ability of tribal members to make their own laws and be governed by them. Although Mr. Maryboy is an enrolled member of the Navajo tribe and lives on the Reservation, his income is not derived from "value generated on the reservation." *Colville*, 447 U.S. at 156–57, 100 S.Ct. at 2082–83. When he is working as a county commissioner on the Reservation, he is still functioning in a county capacity and receiving the benefits derived from citizen participation in state government. That he spends time on the Reservation in his official county commissioner capacity does not diminish the distinct nature of his employment; Mr. Maryboy does not lose his status and powers to function as a county commissioner when he steps onto the Reservation.

The Navajo Nation asserts that allowing the state to impose this tax nullifies the tribe's prerogative not to impose an income tax on its tribal members and thus infringes on tribal self-government. However, the tax does not interfere with the tribe's power to impose its own income tax; each government may impose, or not impose, its tax without ousting the other. *Colville*, 447 U.S. at 158, 100 S.Ct. at 2083–84; *Cotton Petroleum*, 490 U.S. at 188, 109 S.Ct. at 1713–14. In addition, Native Americans going beyond the boundaries of the reservation have "generally been subject to nondiscriminatory state law otherwise applicable to all citizens of the State" absent express federal law to the con-

trary. *Mescalero*, 411 U.S. at 148–49, 93 S.Ct. at 1270. Mr. Maryboy's employment as a publicly elected official in the State of Utah is necessarily beyond the Reservation boundaries and tribal self-government. As such, it is subject to the same nondiscriminatory tax laws otherwise applicable to citizens of Utah. *See Colville*, 447 U.S. at 151, 169, 100 S.Ct. at 2080, 2089.

We hold that the state interests involved overcome the *McClanahan* presumption against finding state authority and that state taxation of Mr. Maryboy's income as a county commissioner does not violate federal law. Accordingly, we affirm the Commission's ruling that Mr. Maryboy's entire income as a county commissioner is subject to Utah income tax. We reverse the Commission's ruling that Mrs. Maryboy's income as an employee of San Juan Mental Health is taxable in Utah.

## II. PAYMENT OF DEFICIENCY

The Maryboys assert that the Commission's order requiring them, pursuant to Utah Code Ann. § 59–1–505,[3] to deposit the deficiency of income taxes, penalties, and interest prior to pursuing this appeal violated their constitutional right to have open access to the courts of this state. They assert that the uncontradicted evidence presented at the hearing on limited remand demonstrated that they did not have sufficient liquid assets available to pay the deficiency and that virtually all of their discretionary income would be spent in loan payments if they obtained a loan to pay the deficiency. Thus, they contend that, under *Jensen v. State Tax Commission*, 835 P.2d 965, 969 (Utah 1992), the Commission should have allowed them to seek judicial review without paying the deficiency. We disagree.

**3.** Section 59–1–505 provides, "A taxpayer who, after receiving a final decision from the commission in accordance with the other provisions of this part, desires to seek judicial review of that decision shall deposit the full amount of the taxes, interest, and penalties with the commission."

**4.** Article I, section 11 of the Utah Constitution states:

In reviewing the Commission's order, we grant the Commission deference concerning its factual determinations, "applying a substantial evidence standard of review." Utah Code Ann. § 59–1–610(1)(a) (Supp.1994); *see Kennecott Corp. v. Utah State Tax Comm'n*, 858 P.2d 1381, 1385 (Utah 1993). Substantial evidence is " 'that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *Utah Assoc. of Counties v. Tax Comm'n ex rel. Am. Tel. & Tel. Co.*, 895 P.2d 819, 821 (Utah 1995) (quoting *U.S. West Communications v. Public Serv. Comm'n*, 882 P.2d 141, 146 (Utah 1993)). We do not reweigh the evidence but defer to the Commission to resolve issues involving conflicting views if its findings are supported by substantial evidence. *See Utah Assoc. of Counties*, 895 P.2d at 821.

Our review of the record reveals substantial evidence to support the Commission's findings on limited remand. The Commission found that the Maryboys "had a combined income in 1992 of over $77,000." The Commission also found, "In addition to owning savings bonds and maintaining a pension plan worth $47,000, [the Maryboys] own two residences and two relatively new vehicles." On the basis of that evidence, the Commission determined that the Maryboys had the ability to pay the deficiency, but found it inconvenient to do so.

Relying on *Jensen*, the Commission found that the inconvenience the Maryboys would suffer in procuring the $10,855.38 deficiency was not sufficient to deny them reasonable access to judicial review. We agree. In *Jensen*, this Court addressed whether § 59–1–505 violates the open courts provision, article I, section 11 of the Utah Constitution.[4] The petitioners in *Jensen* had been assessed a deficiency of $344,419 in income taxes, penalties, and interest. They were unable to

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

comply with § 59-1-505, and thus strict application of that section precluded judicial review of the Commission's final order. We stated that "to the extent § 59-1-505 precludes reasonable access to judicial review, it violates the open courts provision" and held, as applied to the facts of that case, that it was an effective bar to judicial review and was unconstitutional as applied. *Jensen,* 835 P.2d at 969.

Unlike the petitioners in *Jensen,* the Maryboys were financially able to pay the $10,-855.38 deficiency. Although the requirement in § 59-1-505 inconvenienced them, it did not deny them reasonable access to judicial review. As we made clear in *Jensen,* § 59-1-505 "is not unconstitutional in all cases. When a taxpayer is able to meet the requirement, the deposit must be paid." 835 P.2d at 969. This is just such a case.

Affirmed in part; reversed in part.

ZIMMERMAN, C.J., and DURHAM and RUSSON, JJ., concur.

HOWE, Justice, concurring and dissenting:

I concur except as to that part of the opinion dealing with the income of Mrs. Maryboy from state employment. As to that part, I dissent.