ELKS LODGES NO. 719 (OGDEN) AND
NO. 2021 (MOAB), Petitioners,

v.

DEPARTMENT OF ALCOHOLIC
BEVERAGE CONTROL,
Respondent.

MOOSE LODGES # 259 (SALT LAKE
CITY) AND # 2031 (TOOELE),
Petitioners,

v.

DEPARTMENT OF ALCOHOLIC
BEVERAGE CONTROL,
Respondent.

Nos. 940105, 940197.

Supreme Court of Utah.

Oct. 23, 1995.

P. Keith Nelson, Christian W. Nelson, Salt Lake City, for the Elks.

Harold G. Christensen, Richard A. Van Wagoner, Salt Lake City, for the Moose.

Jan Graham, Atty. Gen., Frank D. Mylar, Asst. Atty. Gen., and Earl F. Dorius, for Department of Alcoholic Beverage Control.

DURHAM, Justice:

This case is a consolidation of separate petitions filed by two Elks lodges and by two Moose lodges, both seeking review of orders of the Department of Alcoholic Beverage Control Commission. Because petitioners raise identical claims, we consider them together. Differences between petitioners will be discussed in the analysis portion of this opinion.

## I. FACTS AND PROCEDURE BELOW

On August 19, 1993, the Commission of the Division of Alcoholic Beverage Control (DABC) served notice on twelve Elks lodges, two Moose lodges, and two other private clubs that the organizations, each of which possessed a private club liquor license issued pursuant to Utah Code Ann. §§ 32A–5–101 to –108, would be subject to formal DABC action for failing to comply with agency directives prohibiting discrimination on the basis of gender. These directives provided that clubs discriminating in their membership policies would not be allowed to maintain state liquor licenses. The DABC issued these directives to clubs which it believed to be practicing illegal discrimination after this Court's decision in *Beynon v. St. George–Dixie Lodge # 1743*, 854 P.2d 513 (Utah 1993). In *Beynon*, we held that the Utah Civil Rights Act, Utah Code Ann. §§ 13–7–1 to –4 (UCRA), proscribing discrimination based on

race, color, sex, religion, ancestry, or national origin, applied to the St. George–Dixie Elks Lodge notwithstanding its status as a "private" club. *Id.* at 518.

Upon receiving notice from the DABC of forthcoming hearings, two clubs summarily amended their bylaws and signed statements that the clubs would not discriminate on the basis of race, religion, or gender in their membership policies. Formal hearings were scheduled to investigate whether the other clubs were in violation of DABC policy, specifically, whether the clubs complied with the UCRA.

A formal evidentiary hearing was held before the DABC on October 22, 1993, to determine whether the Elks clubs violated DABC directives to end the above-described discrimination. At or before this hearing, three Elks lodges voluntarily surrendered their private club liquor licenses to the DABC and began leasing a portion of their premises to newly formed clubs which do not discriminate in their membership policies, with the understanding that these clubs would apply for state liquor licenses. At the hearing, the DABC determined that the remaining nine Elks lodges were in violation of DABC directives to end discriminatory membership policies. On November 19, 1993, the DABC signed a final order suspending the liquor licenses of the nine Elks lodges. Seven of the nine Elks lodges eventually surrendered their liquor licenses, while the remaining two, the Elks petitioners in this case, lodged a petition for a writ of review with the Utah Court of Appeals.

The DABC also conducted formal hearings in January 1994 to determine whether the Moose lodges in question were in compliance with DABC directives. Following the formal hearings, the DABC entered an order suspending the liquor licenses of both Moose lodges on January 28, 1994, on the basis that the membership practices of the Moose were discriminatory. On February 25, 1994, the Moose lodges filed a review request with the Utah Court of Appeals. These petitions have been transferred to this court pursuant to section 78–2–2(3)(b) of the Utah Code.

Petitioners in both cases are private, non-profit fraternal organizations. The Elks and Moose lodges involved in this proceeding are units of national orders of Elks and Moose clubs. As such, they are required by club charter to abide by the rules and bylaws of the national organizations. The Elks and Moose lodges prohibit women from membership in their organizations. However, they do allow women to become members of auxiliary units of the lodges, known respectively as Ladies of the Elks and Women of the Moose. Ladies of the Elks is an auxiliary comprised of female relatives of local Elks lodge members. Women of the Moose is broken into two separate groups: The Home Chapter of Women of the Moose, members of which are not related to Moose members, and Women of the Moose, members of which may or may not be related to Moose members. Pursuant to club charters and bylaws, women may not vote or participate in the governance of the Elks and Moose lodges or in the governance of the private liquor clubs established within these lodges.

Each of the petitioning lodges has been issued private-club liquor licenses pursuant to Utah Code Ann. §§ 32A–5–101 to –108. These licenses are held by lodge units which prohibit female members. Therefore, these lodges prohibit women from becoming members of their respective private liquor clubs; even women who are auxiliary unit members are considered guests of the liquor club. For instance, the Rules and Regulations for Private Club Operation promulgated by the general House Committee of the Loyal Order of Moose state that a "qualified guest" of the private club is defined, inter alia, as "a member of good standing of the Women of the Moose." Those rules also indicate that women who are family members of Moose members or the "ladyfriend" of a Moose member must leave the club (as must all prospective male Moose members) when the sponsoring Moose member leaves. However, at each lodge, women who are deemed "qualified guests" are allowed access to the social quarters where liquor is sold and are allowed to purchase liquor.

### A. Complaints

The Elks and Moose lodges seek review on several grounds of the DABC's decision to

suspend their liquor licenses. First, petitioners attack the constitutionality of both the UCRA and the various alcoholic beverage control acts on the ground that they facially violate petitioners' freedom of association by purporting to regulate private organizations. They next argue that these acts are unconstitutional as applied to petitioners because they condition the grant of a state-endowed privilege (a liquor license) upon the voluntary relinquishment of petitioners' constitutional rights (the right of free association). They also argue that the acts involved are unconstitutionally vague and overbroad. Finally, they argue that the DABC's finding that petitioners discriminated against women is clearly erroneous because no woman has either applied for or subsequently been denied membership in their specific lodges. They also argue that because women are allowed to purchase liquor at their clubs, there has been no act of discrimination to warrant the DABC's decision to suspend their licenses.

## II. STANDARD OF REVIEW

Because this court is asked to review the decision of a state administrative agency, the standard by which we review the decision is governed by the Utah Administrative Procedures Act (UAPA). Utah Code Ann. §§ 63–46b–0.5 to –22. Regardless of the standard of review the court uses, UAPA requires that no decision of an administrative agency be altered by an appellate court unless the party seeking review has been "substantially prejudiced" by the agency's actions. Utah Code Ann. § 63–46b–16(4). Apprised of that threshold, we review agency decisions based on the following model:

■ In reviewing an agency's factual findings, we will affirm them only if they are "supported by substantial evidence when viewed in light of the whole record before the court." Utah Code Ann. § 63–46b–16(4)(g); *see also Kennecott Corp. v. State Tax Comm'n*, 858 P.2d 1381, 1385 (Utah 1993). Such findings "will not be overturned if based on substantial evidence, even if another conclusion from the evidence is permissi-

ble." *Hurley v. Board of Review*, 767 P.2d 524, 526–27 (Utah 1988). We have defined "substantial evidence" as the "quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990).

■ Challenging an agency's findings of fact, then, imposes a marshaling burden on the petitioner. A party seeking to overturn a commission's factual findings must marshal all of the evidence supporting those findings and demonstrate that despite such evidence, those factual findings are not supported by substantial evidence from the record. *Kennecott*, 858 P.2d at 1385.

■ This court applies differing standards of review to an agency's legal interpretations. First, where the legislature has explicitly or implicitly delegated discretion to the agency to interpret or apply that law, an intermediate deference standard of review is applied. *See Zissi v. Tax Comm'n*, 842 P.2d 848, 852 & n. 2 (Utah 1992). And second, where there is no explicit delegation of discretion and the issues are questions of constitutional law and statutory construction, we review the agency's decision for correctness. *Id.*

## III. ANALYSIS

### A. Freedom of Association

Petitioners argue that the DABC's decision to suspend their liquor licenses for failure to allow women full membership rights in their organizations violates their right to freedom of association under the First and Fourteenth Amendments of the United States Constitution and under article I, sections 1 and 7 of the Utah Constitution.[1] This court has already held that a private club's liquor license may be suspended for discriminating against women without encroaching upon the club members' rights of association. In *Beynon v. St. George–Dixie Lodge # 1743, Benevolent & Protective Order of Elks*, 854 P.2d

---

1. Because petitioners do not brief this court on the meaning, content, or scope of the Utah Constitution provisions, as distinguished from the

United States Constitution's protections, we treat only the federal constitutional issues.

513 (Utah 1993), this court held that the decision to suspend the Elks' liquor license for declining membership to Sandra Beynon solely because of her gender "does not implicate the right to free association." *Id.* at 518. As we stated in that case:

> [A]ny entity seeking a private club liquor license must submit itself to the intense regulation imposed by the state legislature.... The Elks *voluntarily* elected to abide by the laws of Utah, including the [UCRA], when it applied for and received a private club liquor license.... As long as the Elks maintains its liquor license, it may not discriminate. Our decision *does not impinge on the Elks' right to free association;* it merely precludes the Elks from using a state liquor license in a discriminating fashion.

*Id.* (emphasis added) (citing *Cornelius v. Benevolent Protective Order of Elks,* 382 F.Supp. 1182 (D.Conn.1974)).

██ In their briefs, petitioners attempt to establish that Moose and Elks Orders are "private" organizations and hence protected from government interference regarding their associational rights. Their arguments are inapposite. It is undisputed that these organizations are to some extent "private." The Alcoholic Beverage Control Act *requires* that organizations be private to obtain a private club liquor license. Utah Code Ann. § 32A–5–101. However, status as a private club does not confer upon these clubs the right to "promote prejudice for profit" by and through a state-granted liquor license. *Cornelius,* 382 F.Supp. at 1204. In *Beynon,* we stated, "We need not determine whether Elks activities should be constitutionally protected because the Elks is free to relinquish its liquor license." 854 P.2d at 518–19. Nonetheless, examination of the rights protected by the First Amendment demonstrates that the Elks and Moose lodges have not presented a cognizable claim under the implied right to freedom of association contained in that amendment.

We begin by noting that the right of association is not expressly guaranteed in the United States Constitution. As a right distilled from the broad terms of the First Amendment, its history is relatively brief. The constitutional right to associate with persons of one's own choosing was first, and in a very limited fashion, recognized as a guaranteed right only thirty-seven years ago in *NAACP v. Alabama,* 357 U.S. 449, 466, 78 S.Ct. 1163, 1174, 2 L.Ed.2d 1488 (1958).[2] Initially, this right was viewed as a limited extension of the right of free speech. Essentially, the Court protected those who sought to prevent the disbursement of membership lists of unpopular organizations, as such action would have had a chilling effect on those who wanted to support and endorse political speech in the context of an institution. *See, e.g., Bates v. City of Little Rock,* 361 U.S. 516, 527, 80 S.Ct. 412, 419, 4 L.Ed.2d 480 (1960); *Shelton v. Tucker,* 364 U.S. 479, 490, 81 S.Ct. 247, 253, 5 L.Ed.2d 231 (1960). In both of those cases, governmental entities were prohibited from requiring individuals to disclose the organizations they patronized as members. Through this protection, persons who were unwilling to individually voice unpopular opinions could speak indirectly by supporting organizations whose tenets reflected its patrons' beliefs.[3]

██ The first hint that the First Amendment guaranteed the right of free association outside of this narrow speech-oriented context came in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). There, in dicta, Justice Douglas stated that the right of association, in some form, was protected in ways "that are not political in the customary sense but pertain to the social, legal and economic benefit of the members." *Id.* at 483, 85 S.Ct. at 1681. It was not until the 1970s that the Supreme Court clearly recognized the rights of indi-

---

2. The Supreme Court did occasionally refer to a right of associational freedom in other opinions before formally recognizing the right in *NAACP. See, e.g., Sweezy v. New Hampshire,* 354 U.S. 234, 249, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957); *Whitney v. California,* 274 U.S. 357, 371, 47 S.Ct. 641, 646–47, 71 L.Ed. 1095 (1927).

3. This should not be construed to mean that all members of the organizations involved in early freedom of association proceedings wanted their membership in the involved organizations kept secret, only that those who did wish such secrecy were entitled to it.

viduals to associate with others as a separate, independent claim. *See, e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 502–05, 97 S.Ct. 1932, 1937–39, 52 L.Ed.2d 531 (1977) (protecting rights of certain nonimmediate family members to cohabit). However, the recognition of this right does not wholly remove the right of the state to regulate certain aspects of gatherings. "The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas...." *Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). It is well recognized that the more public a gathering is, the more the state may impose regulatory burdens on the functions of the group. *Id.*

Therefore, the history of First Amendment jurisprudence regarding the right of free association indicates first that the right is not absolute; it is instead a right which exists on a continuum of protection. The more intimate and personal a gathering, such as a family gathering, the more limited is the state's ability to influence or regulate the associational choices made by the group. By contrast, the larger the group and the more its activity is open to a cross-section of the community, such as a business organization, the less claim that organization has to constitutional protection. Critical examination of the early association cases demonstrates also that regardless of the extent to which the right exists, it is not absolute. The less the right is protected, the lower the threshold for state regulation, while the more the right deserves protection, the more compelling the state's interest must be to merit interference. Our decision in *Beynon* has already established that the state interest in prohibiting gender-based discrimination outweighs whatever associational interest, if any, the Elks or the Moose may have in maintaining state-licensed liquor clubs. *Beynon,* 854 P.2d at 518.

Notwithstanding our decision in *Beynon,* the parties have cited numerous cases dealing with instances where a state has or has not been found authorized to impose restrictions on "private" group functions. Petitioners rely heavily on *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and its progeny for the notion that the state cannot suspend a liquor license solely for the practice of discrimination in private settings. The DABC relies in turn upon *Roberts* and its progeny for the notion that a state's civil rights act can proscribe discrimination against women by a private organization when that organization's level of intimacy is so low as to place it within the realm of state regulation. Because our opinion in *Beynon* did not explicitly examine these cases, we now discuss their impact on the present dispute.

Petitioners' reliance on *Irvis* in the context of the present case is misplaced. *Irvis* stands for the proposition that in constitutional analysis, the state's issuance of a liquor license to a discriminatory organization is not sufficient "state action" to create a valid claim under the Fourteenth Amendment. *Irvis,* 407 U.S. at 176–77, 92 S.Ct. at 1973–74. In making this determination, the Supreme Court pointed out that any group that meets in a building is in some way linked to the state through the state's regulation of water and sewer lines, electricity, and phone lines—all of these services are supplied to organizations which may discriminate in any number of ways. *Irvis* held that merely issuing a license to an entity that discriminates against a certain class of persons cannot be sufficient in and of itself to support a finding that the state itself is a discriminating actor. *Id.* Therefore, because *Irvis* had failed to show sufficient involvement *by the state* in the Moose's discriminatory practices, his equal protection claim was dismissed. *Id.* at 179, 92 S.Ct. at 1974.

*Irvis* and its progeny, while valid law, are inapplicable to the scenario before us. There is no claim of discriminatory *state involvement* by any party, and petitioners' liquor licenses were not suspended as a result of equal protection violations based on the Fourteenth Amendment. Instead, they were suspended for violations of the UCRA, which states that not only the state, but even individuals, while acting in public or regulated capacities, can be sanctioned for discriminat-

ing against protected classes. Therefore, the *Irvis* holding is not controlling.

The Moose petitioners also refer us to the recently issued opinion in *Hurley v. Irish–American Gay Group of Boston,* —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). In that case, the Supreme Court held that the Massachusetts public accommodations law could not be used to force private parade organizers to allow a group to march in their parade when that group wished to impart a message which the parade organizers did not want to convey. *Id.* at ——, 115 S.Ct. at 2343. However, that opinion does not treat the issues that are before this court today. *Hurley* addressed only the right to control the content of a parade's "message" under the First Amendment's guarantee of free speech; it specifically did not address the issue of *participation* of protected groups in the parade. "[The law's] enforcement does not address any dispute about the participation of openly gay, lesbian or bisexual individuals in various units admitted to the parade. The petitioners disclaim any intent to exclude homosexuals...." *Id.* at ——, 115 S.Ct. at 2347. In fact, *Hurley* further distinguished the two scenarios: "[Laws prohibiting] discrimination on the basis of 'race, color, religious creed, national origin, [or] sex ...' in 'the admission of any person to, or treatment in any place of public accommodation ...' are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, *and they do not, as a general matter, violate the First or Fourteenth Amendment[ ]." Id.* at ——, 115 S.Ct. at 2346 (emphasis added) (quoting Mass.Gen. Laws § 272:98) (citing *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11–16 (1988); *Roberts,* 468 U.S. at 624–26, 104 S.Ct. at 3253–54). Therefore, *Hurley* has no application to the issues presented by a state-licensed liquor club's decision to wholly exclude an entire class of society from participation.

We next turn to *Roberts,* where the Supreme Court held that the Minnesota Human Rights Act, which prohibits discrimination against women, applied to all places of "public accommodation" within that state, includ-

ing "private clubs" such as the Jaycees, and that the enforcement of the act did not amount to a denial of the Jaycees' right to free association. The analysis contained in that opinion is very persuasive.

Many of the claims petitioners raise in the present case were addressed by the Court in *Roberts.* Ironically, the Elks cited *Roberts* in the *Beynon* case, arguing that they deserved the protections denied to the Jaycees. In rejecting their argument, we stated that we did not need to decide whether the Elks' activities were protected because the Elks were free to relinquish their liquor license and continue their membership policies. *Beynon,* 854 P.2d at 518–19. Closer examination of *Roberts* demonstrates that the Elks and the Moose are similarly situated to the Jaycees, and their claims to associational protections fail for the same reasons the Supreme Court rejected the Jaycees' claims.

*Roberts* arose as a conflict between the Jaycees, a nonprofit, fraternal private club, and the commissioner of the Minnesota Department of Human Rights. After an investigation of the Jaycees' membership policies, the commissioner found "probable cause to believe" that those policies violated the state's human rights act. 468 U.S. at 615, 104 S.Ct. at 3248. Initially, the local chapters of the Jaycees began accepting women members, and they even allowed women on the clubs' governing bodies. However, the national Jaycees organization threatened sanctions against the local units unless they complied with national policy prohibiting women membership. *Id.* Like the instant case, no woman had been actually denied membership by the Jaycees when the dispute arose. *Id.* at 614–16, 104 S.Ct. at 3247–49. In fact, the complaint of discrimination was actually filed by current members of the Minnesota Jaycees who did not want to be forced to conform with national Jaycees requirements. *Id.* at 614, 104 S.Ct. at 3247. The commissioner found that the standing policy against women members violated the state's human rights act. *Id.* at 615–16, 104 S.Ct. at 3248–49. The Jaycees appealed this decision, arguing that it violated their right to freedom of association.

The Supreme Court began its analysis in *Roberts* with a history of the right to freedom of association, noting that the more intimate the setting, the more important the need to protect the right, and conversely, the more public the setting, the less protection the right receives. *Id.* at 620–22, 104 S.Ct. at 3250–52. Observing that membership in the Jaycees was open to virtually any male within the allotted age category, *id.* at 613, 621, 104 S.Ct. at 3247, 3251, and that the club had national membership figures in the thousands, the Court concluded that the group could not be considered an extremely "intimate" organization needing heightened protection under the First Amendment. *Id.* at 621, 623, 104 S.Ct. at 3251, 3252; *see also id.* at 631, 104 S.Ct. at 3256–57 (O'Connor, J., concurring). We find the membership policies of the petitioners in this case to be substantially similar to those of the Jaycees. All require their members to be of "good moral character" but, to a large degree, accept most male applicants into the club.[4] We note that the Moose organization purports to be "the largest fraternal organization . . . in the world," claiming approximately 1,000,225 members.[5] The large size of the national Jaycees organization was one of the controlling factors that the Supreme Court found to prevent the Jaycees from deserving constitutional protection of their associational rights. *See Roberts,* 468 U.S. at 631, 104 S.Ct. at 3256–57 (O'Connor, J., concurring) ("Whatever the precise scope of the rights recognized in such cases, they do not encompass associational rights of a 295,000–member organiza-

tion whose activities are not 'private' in any meaningful sense of that term."). The Elks and the Moose are both indisputedly larger organizations than the Jaycees.

 We also note that while the Jaycees, the Elks, and the Moose all have some "private" aspects of their membership, all of these clubs function in a highly social, public way. For instance, many Elks clubs also function as public restaurants, and the various lodges are often offered to the public for use as gathering places for weddings or other social functions.[6] We also note that like the Elks and Moose lodges, the Jaycees did allow women to become members of auxiliary units of the club. *Id.* at 613, 104 S.Ct. at 3247. The only difference between men and women members in the Jaycees was that as "associate members," women were not allowed to vote or hold office in the club. *Id.* We note that because of their status as guests of the private liquor club, Ladies of the Elks and Women of the Moose are likewise prohibited by state law from such participation. *See* Utah Code Ann. § 32A–5–103(1)(a) ("Each member shall own one share of stock and no member or other person shall own or control, directly or indirectly, more than one share."); *id.* § –103(1)(e) ("The club shall be managed and operated by a governing board, . . . each of whom is a shareholder or voting member of the club and is elected by the holders of shares or members entitled to vote.").[7] Therefore, as the Supreme Court concluded in *Roberts,* we conclude that the

4. Some of the lodges have more restrictive membership policies than those established in the lodges' national bylaws. For example, we note that the Tooele Moose Lodge prohibits all non-whites as well as all women.

5. 12 Utah Alcoholic Beverage Control Commission Proceedings, *DABC v. MOOSE # 's 2013, 259,* at 14, 17 (Nov. 19, 1993).

6. The Moose petitioners argue that because they do not hold themselves out to the public as frequently as the Elks, they are a more private group and therefore escape the application of the UCRA. This argument is without merit. In *Beynon,* we held that the UCRA applies to all groups issued a state liquor license. 854 P.2d at 518. Therefore, once a group has accepted a state liquor license, it has accepted concurrently the

burden of comporting with license regulations, which preclude, inter alia, violations of the UCRA. *See id.*

7. Another similarity between the Jaycees, the Elks, and the Moose is the participation of women through auxiliary units. In *Roberts,* the Court noted that this participation preempted the clubs' right to argue that their right to political speech will be burdened by forcing them to accept women members. That is, by arguing that women are already allowed access to the clubs' activities and therefore not discriminated against, the clubs cannot also maintain that they desire to exclude women for intimate or political purposes. *Id.* at 627, 104 S.Ct. at 3255. *Roberts* also indicated that the argument that allowing women access to club activities but preventing them from voting is an important symbolic message "is attenuated at best." *Id.*

state's interest in ending gender-based discrimination outweighs the protection the state needs to offer petitioners regarding their right of association. *Id.* at 623, 104 S.Ct. at 3254.

In his concurring and dissenting opinion, Justice Stewart draws a distinction between the Elks and the Moose for purposes of application of the UCRA. He agrees, in essence, that the Elks are bound by the UCRA but would hold that the Moose are not. However, this distinction is based solely upon interpretation of certain facts which Justice Stewart believes render the two organizations different for First Amendment purposes. This distinction lacks legal support and contradicts binding precedent from both this court and the Supreme Court.

In *Beynon,* we held that *all* licensees of the DABC were required to comply with the UCRA, not only those licensees deemed "most" public in nature. "Under the [Alcoholic Beverage Control Act], *any entity* seeking a private club liquor license must submit itself to the intense regulation imposed by the state legislature." *Beynon,* 854 P.2d at 518 (emphasis added). Justice Stewart's opinion directly contradicts this holding by suggesting that only those clubs which are deemed sufficiently "public" are required to obey the UCRA, while other licensees are not.[8] In fact, legal standards do exist by which public laws may be applied to private organizations.

In *Roberts,* the Supreme Court undertook a lengthy discussion of the distinction between public and private organizations in relation to the application of state civil rights laws. 468 U.S. at 619–22, 104 S.Ct. at 3250–52. *Roberts* noted initially that there is a spectrum of private groups, characterized by many nuances. At one end, groups characterized as small, intimate, and highly selective in affiliation are generally afforded broad constitutional protections. At the other extreme are large, complex businesses and organizations that lack the intimacies of small groups. These may well be privately owned or organized groups, but they are much less in need of strict constitutional protection of associational rights because of their size and relatively impersonal nature. *See id.* In deciding which end of the spectrum most closely described the Jaycees, the Court focused on the size of the national Jaycees organization, the less-than-strict observance of club rules and bylaws, and the lack of meaningful discriminatory requirements for membership. *Id.* at 620–22, 639, 104 S.Ct. at 3250–52, 3261. Having concluded that the Jaycees were more like the impersonal business organization than the small, intimate organization, the Court held that the Jaycees were subject to the Minnesota human rights laws. *Id.* at 628–29, 631, 104 S.Ct. at 3255–56, 3257. An examination of these factors in relation to the Moose yields the same result. Like the Jaycees, the Moose is a large national organization. In fact, the organization itself purports to be the world's largest fraternal organization, with over one million members. As Justice O'Connor observed, whatever associational protections have been recognized for groups in previous First Amendment jurisprudence, those cases "do not encompass associational rights of a 295,-000–member organization whose activities are not 'private' in any meaningful sense of that term." *Id.* at 631, 104 S.Ct. at 3257 (O'Connor, J., concurring). Justice Stewart's decision to include a group with over one million members in a category that does not include a group of 295,000 is perplexing.

Another element that exposed the Jaycees to state regulation in *Roberts* was the informal application of their own bylaws prohibiting women members. *Id.* at 621, 104 S.Ct. at 3251.[9] The Moose petitioners have likewise

---

8. The main difference between the organizations, as cited by Justice Stewart, is that the Elks "offer their facilities to the public" by operating restaurants and catering to social activities; by actively recruiting new members; and by conducting activities in which non-Elks participate. By contrast, he states that the Moose "do not operate public restaurants ..., do not open their facilities to the public ..., do not encourage nonmembers to participate," and have more stringent guidelines that apply to nonmember guests.

9. The dissent suggests that we misconstrue *Roberts* because we claim that *Roberts* considered the size of the national organization of Jaycees, not merely the size of local chapters, and that our opinion states that the Supreme Court considered the Jaycees' casual attitude about their own bylaws in conjunction with its decision that the

admitted that the bylaws prohibiting women from bringing guests to the social quarters are "never enforced." [10] Finally, as the Supreme Court noted of the Jaycees, the Moose organization has no meaningful criteria to discern which applicants will be selected for membership. Both national and local Moose clubs offer membership to any males above the age of twenty-one years who are of good character, believe in God, are not members of the Communist party, and have not been convicted of a felony. These are not "highly selective" criteria, as outlined in *Roberts*. 468 U.S. at 620, 104 S.Ct. at 3251. Indeed, there is no evidence in the record of any male applicant being denied Moose membership. Nor can the Moose truly be said to prohibit nonmembers from participating in their activities, as asserted by Justice Stewart, when the Moose clubs themselves admit that they routinely allow women (who are not members) to participate in liquor club use *and* to vote on certain matters despite their own bylaws' forbiddance of the practice.

■ Therefore, the distinction drawn by Justice Stewart between the Elks and the Moose for purposes of the UCRA is contrary to the precedent of this court in *Beynon* and to Supreme Court precedent in *Roberts*. Moreover, the factual discrepancies which Justice Stewart finds determinative, such as selectivity and nonmember segregation, are not supported by the record. *See Warfield v. Peninsula Golf & Country Club*, 10 Cal.4th 594, 42 Cal.Rptr.2d 50, 61–62, 896 P.2d 776, 777–78 (Cal.1995) (holding that a private club must comply with the California civil rights act). "[A]n entity is not automatically exempt from the strictures of [the civil rights act] simply because it characterizes itself as a 'private social club'.... [A]n entity is not invariably immune from the nondiscrimination mandate of [the act] simply because it exhibits some of the attributes of a private club." *Id.* at 64, 896 P.2d at 791.

At this point, it should also be noted that the sale and consumption of liquor is highly regulated in the state of Utah. Whereas the *Roberts* opinion dealt only with the principle of discrimination in a large social organization, the Moose and Elks lodges in question are some of the relatively few establishments in this state that are allowed to sell liquor. Citizens in Utah may purchase liquor only through state liquor stores (where no consumption is allowed), at licensed private clubs, or at licensed restaurants. That makes discrimination by these clubs more egregious because it lessens the availability of certain classes of persons to purchase liquor for consumption for themselves or guests. In other words, if we were to hold that all private clubs were allowed to discriminate against groups protected by the UCRA, it could theoretically result in the total exclusion of these groups from important social opportunities. It goes without saying that social clubs are often used for entertaining business clients as well as personal friends; the result sought by petitioners would thus permit exclusion of a signifi-

Jaycees were not entitled to the heightened protection of a highly intimate group. However, we note that while the dissent is correct that the *Roberts* majority mentions only the size of local chapters in its conclusion, 468 U.S. at 621, 104 S.Ct. at 3251, the majority specifically mentions the size of the national organization in its description of the Jaycees' characteristics elsewhere in the opinion. *E.g., id.* at 613, 104 S.Ct. at 3247,

Moreover, in numerous places the *Roberts* majority analyzes instances where the Jaycees have violated their own bylaws by allowing women to participate. *E.g., id.* at 614, 104 S.Ct. at 3247–48. ("Currently, the memberships and boards of directors of both chapters include a substantial proportion of women. As a result, the two chapters have been in violation of the national organization's bylaws for about 10 years."); *id.* at 621, 104 S.Ct. at 3251. ("Indeed, numerous non-members of both genders regularly participate in a substantial portion of activities...."); *id.* at 627, 104 S.Ct. at 3255 ("[T]he Jaycees already invites women to share the group's views and philosophy and to participate.... Accordingly, any claim that admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote is attenuated at best."). While not all of these instances highlight the fact that the Jaycees are violating their own bylaws, the opinion's discussion of those regulations clearly informs the reader that each of these activities is indeed a violation of the organization's bylaws. *Id.* at 613–14, 104 S.Ct. at 3247–3248 (setting out the bylaws which these activities violate).

**10.** The Tooele Moose lodge has also adopted a bylaw stating that only "white males" will be allowed to join. This bylaw, according to the Moose's oral argument, is never enforced.

cant portion of the community from important social activities that accompany the regulated sale and consumption of liquor. Any unpopular class or group of persons could be excluded because discriminatory practices would be cloaked by a veil of privacy available to every club where liquor is bought and sold. This case deals with gender discrimination, but it should be emphasized that petitioners' position (and the conclusion of the dissenting opinion) would permit some clubs holding state liquor licenses to discriminate in membership on the basis of race as well. Membership discrimination, in turn, creates the real possibility of service discrimination; if only men or whites can be members of an organization that dispenses liquor and only members are allowed to buy, the liquor license could be used for invidious discrimination.

 Utah's regulatory scheme imposes an affirmative burden to abide by certain standards upon all who dispense liquor. Utah Code Ann. §§ 32A–5–101 to –108. Petitioners, by voluntarily applying for a liquor license, have agreed to become one of the relatively few organizations in this state allowed to dispense liquor.[11] To possess such a license is to perform a quasi-public service to the extent that members of the public in this state can purchase liquor only through regulated licensees. To that end, although petitioners are private organizations apart from the liquor club within each lodge and are entitled to the constitutional protection afforded all private entities, by voluntarily accepting the role of DABC licensee, they acquire a quasi-public status whenever engaged in the buying or selling of alcohol. A private individual may have private rights of speech and association at home, but when that individual enters the public marketplace or even the public work place, her status is transformed; she functions in part as a publicly regulated entity in society. *See Katzenbach v. McClung,* 379 U.S. 294, 299–300, 85 S.Ct. 377, 381–382, 13 L.Ed.2d 290 (1964) (privately owned restaurant cannot exclude black patrons). *See generally Jones v. May-*

*er,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). In all of these cases, privately owned entities were prohibited from discriminating against protected classes of society. These holdings were made despite the fact that the owners of these establishments had rights to associate with whomever they chose and, by implication, to choose not to associate with other persons. By being in the public sphere and in the stream of commerce, they voluntarily surrendered the rights they had in their private lives to discriminate. Likewise, the Elks and the Moose have become subject to the UCRA by agreeing to become licensees of the DABC. It is this legal principle that allows the state to prevent privately owned businesses, such as restaurants, from excluding minorities or members of unpopular ethnic or religious groups. Hence, petitioners' rights of association, which may well be protected in some areas, do not exist in the sphere wherein they make use of a liquor license. "[I]t is important to note that the associational activities of the Elks and Moose are purely social and not political and therefore do not come within the core protection of the right to associate." *Cornelius,* 382 F.Supp. at 1195 (citing *Sigma Chi Fraternity v. University of Colorado,* 258 F.Supp. 515, 523–26 (D.Colo.1966)).

On the basis of the foregoing, we hold that the DABC's decision to apply the UCRA to petitioners does not violate those groups' rights to freedom of association. *Beynon,* 854 P.2d at 518.

### B. Unconstitutional Conditions

 Petitioners next argue that by conditioning the state's largess (liquor licenses) upon the relinquishment of a constitutional right (freedom of association), the state is unconstitutionally conditioning the bestowal of a privilege. However, as explained above, this argument is inapplicable to the suspension of the Elks' and the Moose's liquor

---

**11.** The number of liquor licenses available at any given time is limited by statute. Utah Code Ann.

§ 32A–5–101(4).

licenses because the Elks and the Moose are not entitled to the degree of constitutional protection they claim. *Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252; *Beynon,* 854 P.2d at 518. By accepting liquor licenses, these clubs become enterprises "regulated by the state." To the extent their activities are subject to state regulation, those activities cannot be said to be " 'private' in any meaningful sense of that term." *Roberts,* 468 U.S. at 631, 104 S.Ct. at 3256 (O'Connor, J., concurring); *see also Beynon,* 854 P.2d at 515; *Coalition For Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks,* 333 Md. 359, 635 A.2d 412, 413 (1994). Having made the decision to accept a liquor license, the Elks and the Moose have voluntarily surrendered a portion of their private status. By entering the public sphere, albeit in a limited fashion, they have *voluntarily* surrendered the right of private discrimination on prohibited grounds. *See Cornelius,* 382 F.Supp. at 1195. Because our decision affects only that portion of petitioners' activities that are in the public sphere, it does not impinge upon the right to free association, a private right. *See Roberts,* 468 U.S. at 620, 104 S.Ct. at 3251. Therefore, the "condition" that the state imposes upon all liquor licensees—compliance with all state laws—does not, either directly or indirectly, remove any constitutional rights of the Elks or the Moose. There is no constitutional right to discriminate in the public, as opposed to the private, sphere.

In support of their position, petitioners urge us to adhere to a treatise on unconstitutional conditions by Professor Van Alstyne, where he instructs that what the government cannot do directly, it ought not be able to do indirectly by "coercing" parties to forfeit constitutional rights the government could not itself suspend. *See* William W. Van Alstyne, *The Demise of the Right–Privilege Distinction in Constitutional Law,* 81 Harv.L.Rev. 1439 (1968). However, Professor Van Alstyne also acknowledges:

> The doctrine of unconstitutional conditions has usually been applied only to regulations which directly forbid the enjoyment of an explicit constitutional right. The doctrine has been of little assistance in those situations, however, where the regu-

lation of status *in the public sector* has had only an indirect effect on such a right, without directly and wholly forbidding its exercise. . . . [O]ne has no constitutional right per se to status *in the public sector.*

*Id.* at 1449 (emphasis added).

Justice Stewart's opinion also argues that requiring the state liquor licensees to comply with the UCRA would place an unconstitutional condition upon those clubs. He states, "Whether the Moose lodges 'voluntarily' seek the privilege of a liquor license or whether they are compelled through operation of the state's police power to do so, the regulatory scheme imposes the condition of giving up constitutional rights of freedom of association for the receipt of a benefit from the state." However, Justice Stewart's opinion ignores the operative premise that a state *can* place conditions on the bestowal of benefits; it simply cannot place an unconstitutional condition on that bestowal. Justice Stewart's point would be equally applicable to the Supreme Court in *Katzenbach.* There, the state forced a privately owned restaurant to give up an associational choice of excluding black patrons before it would grant state licensing. *Katzenbach,* 379 U.S. at 299–300, 85 S.Ct. at 381–382. This is precisely the police power that Justice Stewart now attacks. This condition was nevertheless constitutional because the restaurant owner had no right to discriminate publicly. Likewise, the Moose and the Elks may very well be allowed to discriminate in their private meetings. However, where they seek to operate a state-licensed liquor club, the state is permitted to enforce its civil rights act. *Beynon,* 854 P.2d at 518. Hence, the condition placed on liquor club licensing is not unconstitutional.

In sum, our decision does not impose an unconstitutional condition upon the Elks or the Moose because our ruling affects an area of those organizations' activities that does not encompass the right of free association. *Roberts,* 468 U.S. at 623, 104 S.Ct. at 3254; *Cornelius,* 382 F.Supp. at 1195; *Beynon,* 854 P.2d at 518. Again, the condition of nondiscrimination does not require petitioners to

sacrifice any constitutional right that they now possess.

### C. Constitutionality of Utah's Liquor Laws

Petitioners next argue that Utah's liquor laws are unconstitutionally vague and broad. Specifically, they contend that the statutory language relied upon by the Commission to suspend their licenses—"the private club will not be used for permitting gambling or *any other violation of law or ordinance*," Utah Code Ann. § 32A–5–105(2)(c) (emphasis added)—violates their rights to due process of law because the language is overly broad and/or vague.

 This court will construe a challenged statute to avoid constitutional infirmities wherever possible. *Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 920 (Utah 1993). The Commission must similarly prefer a constitutional reading of a statute over an unconstitutional interpretation thereof. *Chris & Dick's Lumber & Hardware v. Tax Comm'n*, 791 P.2d 511, 516 (Utah 1990). Therefore, we will find the statute unconstitutional only if petitioners can demonstrate that the statute is either facially unconstitutional or unconstitutional as applied. In making this determination, we will resolve any reasonable doubt in favor of constitutionality. *Society of Separationists*, 870 P.2d at 920.

 An enactment will be held unconstitutionally vague only if the terms of the law are so ambiguous that persons of ordinary intelligence are unable to determine whether their acts conform to the law. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). The only language that petitioners argue is impermissibly vague is the phrase which indicates that club licensees may not allow their premises to be used to violate "any . . . law or ordinance." Utah Code Ann. § 32A–5–105(2)(c). Petitioners do not argue that this phrase is subject to differing interpretations, nor do they attempt to show that as licensees they are unable to determine whether their conduct conforms to the stat-

ute. The only support petitioners offer for their position is *Atlanta Attractions, Inc. v. Massell*, 330 F.Supp. 865 (N.D.Ga.1971), aff'd, 463 F.2d 449 (5th Cir.1972). In that case, the plaintiff's liquor license had been suspended for allegedly violating several state ordinances. The Georgia scheme allowed for the revocation of a liquor license by the state alcoholic beverage control commission whenever that commission found "due cause." Based on the breadth of this phrase, the court found this ordinance unconstitutional. 330 F.Supp. at 866. *Massell* offers no support for petitioners in this instance, however. First, a showing of overbreadth is not a showing of vagueness. *State v. Hoffman*, 733 P.2d 502, 505 (Utah 1987). Second, we find the language "for due cause" to be distinguishable from language which requires a club to certify that it will not use its premises for gambling or violation of any other laws. While the Utah law may be strict, it is not so vaguely drafted as to make persons of ordinary intelligence guess at whether they are comporting with its requirements. *See, e.g., Papachristou*, 405 U.S. at 162, 92 S.Ct. at 843. We also note that the language of the Georgia statute allows for arbitrary enforcement through the broadly framed term "due cause." There is no such phrase in the Utah statute. In fact, Utah's statute requires the action to be taken by club incorporators, who are required to include a statement of compliance in the club's bylaws. Utah Code Ann. § 32A–5–105(2)(c). The Georgia statute required Alcoholic Beverage Control officials to make the determination of whether the clubs were complying with all state and local ordinances or whether there was "due cause" to revoke the license. The statute was problematic because the operative phrase "due cause" was so broad as to open the door to abuse, as no restrictions or guidelines were imposed on the commission in making this determination. *Massell*, 330 F.Supp. at 866. The facts in the Georgia case are so different from those in our case as to make it entirely inapposite.

Because petitioners have made no showing, either legally or factually, to support their contention that the language of the challenged Utah statute is subject to arbitrary

enforcement or to differing but reasonable interpretations, we hold that the language is not unconstitutionally vague.

 We also hold that the language is not overly broad. Statutory language is overbroad if its language proscribes both harmful and innocuous behavior. Stated another way, a statute is overbroad if it attempts to sanction constitutionally protected activities. *State v. Frampton,* 737 P.2d 183, 192 (Utah 1987). Because the statute in question proscribes club licensees only from allowing activities that are already illegal from taking place on their premises, it does not sanction *any* protected behavior. Also, unlike the Georgia statute, which as noted above places broad discretion in the hands of enforcement officials, the language in Utah's statute is not so broad as to either risk arbitrary enforcement or sanction protected behavior. Therefore, we affirm the Commission's ruling that the challenged language is not unconstitutionally broad. *See also Roberts,* 468 U.S. at 630–31, 104 S.Ct. at 3256–57 (holding that Minnesota Human Rights Act, which prohibits discrimination against women by large social organizations, is neither unconstitutionally vague nor overbroad).

### D. The Scope of the Commission's Authority

Petitioners next argue that the Commission lacks the authority or jurisdiction to enforce the UCRA. To make this point, they rely on our decision in *Williams v. Public Service Commission,* 754 P.2d 41 (Utah 1988), wherein we stated that a commission "can only assert those [powers] which are expressly granted or clearly implied as necessary to the discharge of the duties and responsibilities imposed upon it." *Id.* at 50. Moreover, we stated, "To insure that the administrative powers of the [commission] are not over extended, 'any reasonable doubt of the existence of any power must be resolved against the exercise thereof.'" *Id.* (quoting *Public Serv. Comm'n v. Formal Complaint of WWZ Co.,* 641 P.2d 183, 186 (Wyo.1982)).

 Again, because this issue was recently decided by this court in *Beynon,* we can quickly dispose of petitioners' claims. In making its determination that it could suspend petitioners' liquor licenses for failing to comply with the UCRA, the Commission relied on Utah Code Ann. §§ 32A–5–103(7), 32A–5–102(3)(a) and (b), and 32A–5–105(2)(c). Those statutes give the Commission the power to suspend the license of any club that does not comport with all of the prerequisites set forth in the statutes for obtaining a license.[12] This power is not disputed by petitioners. However, they deny that the UCRA applies to private clubs and, hence, argue that even if petitioners were not comporting with the UCRA, the UCRA does not provide the Commission with a basis for suspending their licenses because that Act is inapplicable to them.

In *Beynon,* however, we specifically held that "the Elks is an enterprise regulated by the State under the [UCRA]." *Id.* at 515. This would likewise apply to the Moose. Therefore, on the basis of *Beynon* and the authorities cited therein, if the Commission finds that any of the Elks or Moose clubs are violating the UCRA, it has the authority to suspend the liquor licenses issued to those organizations. *Id.; see also Annapolis Lodge,* 635 A.2d at 423–24 (holding that City of Annapolis has authority to enact ordinance conditioning grant or renewal of liquor license upon proof that club does not discriminate by gender in its membership policies).

### E. Discrimination

Finally, petitioners contend that even if the UCRA applies to them, the Commission's determination that petitioners have violated the Act is erroneous and must be reversed by this court. As indicated above, when the Commission is interpreting a general state law such as the UCRA, we will review its decision for correctness. *Zissi v. Tax Comm'n,* 842 P.2d 848, 852 & n. 2 (Utah 1992); Utah Code Ann. § 63–46b–16(4)(d).

 The Commission held that because the bylaws of each organization state that

---

12. The statutes further authorize the Commission to make these decisions on the basis of the con- tents of a club's articles, bylaws, or house rules. Utah Code Ann. § 32A–5–102(3)(a).

only males (and only white males in the case of the Tooele Elks Lodge) may be members in the private liquor club, petitioners' actions do not conform to this court's decision in *Beynon* and constitute acts of discrimination in violation of the UCRA. We hold that the Commission correctly applied the UCRA in making this determination.

In *Beynon,* this Court held that the Elks were in violation of the UCRA for denying membership to Sandra Beynon because of her gender. 854 P.2d at 518. However, petitioners now attempt to circumvent the effects of that decision by allowing women in auxiliary units of the clubs to purchase liquor. Therefore, petitioners argue, because women have access to the clubs' liquor facilities, they are not discriminated against in any way.

We are unpersuaded. It is undisputed that petitioners do not allow women to become members of the private club holding the liquor license. While allowed to purchase liquor, women are considered "guests" of the men who sponsor their participation in the social club. As guests, these women are not allowed to vote or otherwise participate in the management of the liquor-selling entity. This is precisely the type of prohibited discrimination found by the Supreme Court in *Roberts,* 468 U.S. at 615–16, 104 S.Ct. at 3248–49. We find it significant that while women are allowed to purchase liquor as guests, they are not allowed to bring guests of their own into the facilities to purchase liquor. In a day and age when many business, political, and other social transactions are conducted in this type of social milieu, it is troubling that either women or members of racial or religious minorities could be excluded from participation. This observation is brought into sharp focus in this state where there are no alternatives to social consumption of liquor other than in private clubs. The social and business disadvantages that would result from allowing this type of discrimination represent precisely the type of unequal treatment the legislature sought to remedy in enacting the UCRA.

As our explanation of the UCRA in *Beynon* demonstrated, the 1973 amendments to the Act were added for the specific purpose of ending gender-based discrimination. 854 P.2d at 517. In *Beynon,* we stated that it is clear from the legislative history of the UCRA "that the legislature intended that the new language be construed broadly." *Id.* In fact, the plain language of the Act states that it "shall be liberally construed with a view to promot[ing] the policies and purposes of the act and to promot[ing] justice." Utah Code Ann. § 13–7–1. Therefore, inasmuch as we are asked today to interpret the meaning of the word "discrimination" as used in that Act, we are bound to "liberally construe[ ] [the act] with a view ... to promot[ing] justice." *Id.* If reasonable minds may differ about the meaning or interpretation of a particular phrase, section 13–7–1 compels us to err toward over-protection of the enlisted classes rather than toward under-protection. As shown above, the legislative intent behind the Act compels our decision that all types of discrimination, active or passive, should be proscribed.

Petitioners specifically ask us to hold today that no act of discrimination has been shown regarding their organizations for two reasons: first, because no woman has applied for, hence, no woman has been denied, membership in the lodges listed in this action, and second, because women, through the above-referenced auxiliaries, have access to the liquor dispensed by each organization and therefore have not, in petitioners' view, been denied anything.

Petitioners' first claim can be summarily dismissed. No women had yet been denied membership in the Jaycees when the petitions in *Roberts* were filed. In fact, current members of the Jaycees were the complainants. 468 U.S. at 614, 104 S.Ct. at 3247. However, petitioners freely admit that the only reason no woman has ever been denied membership is that none have applied for membership. They also freely admit that both their local and national bylaws and national charters would prohibit any woman from becoming a member of their organizations. Accepting petitioners' argument would have the costly and useless effect of causing this case to be remanded until a woman applied for and was denied membership, at which point the entire process of this

case would have to be repeated. It is hornbook law that where it is clearly evident that an injury is about to take place, a party is *not* required to sit idly by and wait for the injury to occur before seeking to remedy the situation. *Id.* Such a holding would be costly to both the citizens of this state and the parties involved in the litigation.

■ The notion of "passive discrimination" has been used in various situations, like the present scenario, where the discrimination is better described as a policy or goal rather than as a specific act. For instance, in interpreting the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1988), the United States Court of Appeals for the Fourth Circuit found that a party involved in sex discrimination against company retirees was properly joined in the suit even though that party's discrimination was wholly policy based, or in other words, "passive." *Chastang v. Flynn & Emrich Co.,* 541 F.2d 1040, 1044 (4th Cir.1976). The district court had dismissed the trustees of a retirement plan which favored female retirees over male retirees, because the discrimination by the trustees, if any, was merely passive—on paper but not in deed. In reversing the trial court's conclusion, the Court of Appeals noted that "the Act makes no distinction between 'active' and 'passive' participants in acts of discrimination." *Id.* Like the trustees in *Chastang,* the local Elks and Moose lodges may have little or no control over the national organizations' positions. Like the trustees in *Chastang,* the local lodges may well be only carrying out the directives of their home orders. However, like the federal act, the UCRA sanctions both "passive" and "active" discrimination. Therefore, the passive act of having a standing policy that prohibits the membership of women is as prohibited as the act of denying someone's membership purely on the basis of gender. That is because the UCRA is concerned with the practice of discrimination as a principle, not just with the mechanics of a specific tangible or physical act. This holding mirrors the Supreme Court's interpretation of Minnesota's Human Rights Act and the interpretation of discrimination implicit in that state's reading of its act.

Our position is also supported by Utah statutory law. The enacting statute of the UCRA states that its purpose is to abolish the *"practice* of discrimination" in its entirety. Utah Code Ann. § 13–7–1 (emphasis added). And as evidenced above, the legislative history of this Act clearly establishes that the Act was amended specifically to prohibit discrimination against women.

We also note that other jurisdictions considering discriminatory membership policies of private clubs have held that with "a showing that attempting to obtain sponsors and file an application would be futile," a party would *not* be required to undergo the expense and humiliation of first applying for and being rejected membership status to have standing to prove discrimination. *Citizens Council on Human Relations v. Buffalo Yacht Club,* 438 F.Supp. 316, 321 (W.D.N.Y. 1977) (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)); *see also Franklin County Sheriff's Office v. Sellers,* 97 Wash.2d 317, 646 P.2d 113, 121–22 (Wash.1982). " '[W]here an employer's acts *deter* [the plaintiff] from applying, strict adherence to the "application" requirement is not mandated.' " *Sellers,* 646 P.2d at 122 (emphasis added) (quoting *Iowa Civil Rights Comm'n v. Woodbury County Community Action Agency,* 304 N.W.2d 443, 451 (Iowa Ct.App.1981)). *"Technical* compliance with [the requirement that an 'act' of application be made] would defeat the purpose of [the Act], which is to be liberally construed to effectuate its purpose to prohibit unlawful discrimination." *Id.* (emphasis added).

We also note that recent cases have rejected the rigid view that specified, catalogued acts must be shown and have adopted the stance that whether discrimination exists should be judged by the totality of circumstances. *See, e.g., Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1502 n. 18 (10th Cir. 1995) (federal definition of discrimination in fair-housing context "does not require proof of differential treatment"); *Doukas v. Metropolitan Life Ins. Co.,* 1995 WL 73345 (D.N.H. 1995) (in context of Americans with Disabilities Act, "discrimination" should be broadly defined so as not to preclude instances of

discrimination even though "difficult to identify and evaluate prior to the filing of a civil action"). Therefore, we are unpersuaded by petitioners' contention that discrimination cannot be shown unless and until a particular woman comes forward to apply for membership and is rejected.

 We next examine petitioners' contention that no discrimination can be shown where women are allowed to be served liquor by and through the auxiliary chapters of the Elks and the Moose. This issue does not directly address the reasons behind the Commission's decision to suspend petitioners' liquor licenses. It is undisputed that women have been and continue to be *served* liquor as guests of the Elks and the Moose. However, this does not address the issue of discrimination in membership practices and management opportunities. Moreover, by analogy, if a club were to have a policy of allowing racial minorities to be served alcohol only if they were accompanied by or related to white club members, that club could not defend its actions on the fact that *some* minorities had in fact been served liquor in the club. The fact that *some* members of the discriminated class have been served does not eliminate the discriminatory *policy* of the club. On the contrary, it illustrates one of the fundamental characteristics of invidious discrimination, namely, the singling out on the basis of prohibited categories of certain persons for different treatment. In some circumstances, treating classes of persons differently from the rest of the community is desirable. For instance, reserving special parking stalls for handicapped individuals does segregate those individuals for purposes of different treatment. However, this segregation is done to protect and encourage that class of persons and to some extent to equalize their access to public spaces. When the segregation is done out of spite, bias, prejudice, or stereotype, that class is not only not protected, it is disadvantaged. *See Brown v. Board of Educ.*, 347 U.S. 483, 493–95, 74 S.Ct. 686, 691–692, 98 L.Ed. 873 (1954); *United States v. Yonkers Bd. of Educ.*, 611 F.Supp. 730, 735 (S.D.N.Y.1985); *see also* Larry Alexander, *What Makes Wrongful Discrimination Wrong? Biases, Preferences, Stereotypes, and Proxies*, 141 U.Pa. L.Rev. 149 (1992) (theorizing that discrimination which hampers one class with no legitimate purpose is both morally and legally wrong).

In fact, petitioners' point that some women are routinely served alcohol at the lodges only serves to highlight the futility of petitioners' claim that their associational and political rights would be violated if forced to associate with women. Petitioners argue on the one hand that barring women is protected, political speech that cannot be removed and that this is an inherent and intimate part of their organization. They argue on the other hand that there is no discrimination because some women are allowed to drink with the men and there is no rule infringing women's access to the "social" facilities.

Aside from the inconsistency presented by petitioners' arguments, there is legal precedent to dismiss this argument as well. For example, California, under its civil rights act, has held that " 'business establishments [may not] withhold[ ] their goods or services from a broad class of individuals in order to "cleanse" their operations from the alleged characteristics of the members of an excluded class.' " *Martin v. International Olympic Comm.*, 740 F.2d 670, 676–77 (9th Cir.1984) (quoting *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721, 180 Cal.Rptr. 496, 498, 640 P.2d 115, 117 (1982)). The court in *Marina* made this pronouncement in a case involving an apartment complex that enacted a rule prohibiting families with children from leasing apartments. The complex in question allowed children to visit the complex but would not allow families with children of their own to sign a lease. The complex allowed the children already living there to remain. *Id.* at 498–99, 180 Cal.Rptr. at 117–18. Thus, *Marina* held that this practice was discriminatory notwithstanding the fact that "some" children were allowed in the complex.

Here, as with *Marina*, the fact that some women are allowed to participate with the Moose and the Elks in some fashion does not remedy the discrimination. *Accord Annapolis Lodge*, 635 A.2d 412. In *Annapolis Lodge*, the Maryland Court of Appeals held that the city of Annapolis had the authority

to issue an ordinance which would revoke the liquor licenses of all private clubs that discriminated against women in membership policies. *Id.* at 423–24. In making its decision, the court noted, but was unaffected by, the existence of the Elks Lodge's Women's Auxiliary which permitted women to be served alcohol, as well as the fact that female guests and dependents of member Elks were also served. *Id.* at 421. Finally, as indicated above, the Supreme Court in *Roberts* was unpersuaded by the Jaycees' claim that no discrimination existed in a club wherein women were allowed to participate in all activities of the club except voting and management. 468 U.S. at 621, 623, 104 S.Ct. at 3251, 3252.

Therefore, we reject petitioners' claims that discrimination cannot be found when women are being served liquor on their premises. Moreover, we find that the Commission correctly applied the UCRA to the lodges through the Alcoholic Beverage Control Act, and we affirm its finding that petitioners practice discrimination in their policies.

## IV. CONCLUSION

Having rejected all of petitioners' arguments and having determined that the Commission properly applied the Utah Civil Rights Act and the Private Club Liquor License provision of the Alcoholic Beverage Control Act, we affirm the DABC's decision to suspend petitioners' private club liquor licenses. In doing so, we note that this problem can be readily addressed by the formation of a separate corporation which would hold the liquor license and to which women would belong. In doing so, the Elks and the Moose would remain separate entities, without necessarily incorporating women into the actual Orders of the Moose or the Elks if such a result is desired, and would use the separate corporation for its liquor-related activities. As highlighted in the facts section of this opinion, various fraternal orders have already done so, and the option is

available, as it always has been, to these petitioners.

HOWE, J., concurs in this opinion.

ZIMMERMAN, Chief Justice, *concurring:*

I concur in the opinion of Justice Durham. I write only to respond to Justice Stewart's opinion.

In my view, there is no threat to the freedom of association posed by the requirement that those who choose to seek to operate a "private club," as that term is used in the liquor laws of this state, not discriminate in whom they permit to "join" the "club." The Elks who were the subject of the *Beynon* opinion have already found a way to comply with the public accommodation law while continuing to discriminate against those whom they do not wish to admit to membership in their fraternal organization. The Elks have simply followed the pattern of all the theoretically "not-for-profit" organizations that by Utah law are exclusively entitled to hold liquor licenses from the state and that operate the many truly for-profit "private clubs" that dispense liquor.[1] They have organized a separate but entirely captive corporation to hold the liquor license and run the liquor dispensing operation. This corporation and its operation comply with the state antidiscrimination law. This permits the Elks' fraternal organization, which is decidedly private, to separate itself from the public liquor dispensing business and to continue to discriminate against anyone it chooses. A similar path is available to the Moose.

To require such a slight artifice of a truly private organization that desires to serve liquor under state license hardly rises to the level of a serious constitutional threat. When such a threat comes along dressed in the guise of a mere regulation, I do not doubt the ability of this court to distinguish it from the present situation.

STEWART, Associate Chief Justice, *concurring in the result in part and dissenting in part:*

I concur in the result with respect to the Elks Lodges and dissent with respect to the

---

1. Utah Code Ann. § 32A–5–102 (providing that as prerequisite to obtaining liquor license, applicant must prove that it "is a corporation or association organized under the Utah Nonprofit Corporation and Cooperative Association Act").

Moose Lodges. In my view, the Liquor Commission's suspension of the Moose Lodges' liquor licenses violates the Moose Lodge members' right of free association under the First Amendment to the United States Constitution.

The Alcoholic Beverage Control Commission conducted formal hearings to determine whether the petitioners discriminated in their membership practices. Solely on the basis of their articles and bylaws, the Commission ruled that the petitioners violated the Utah Civil Rights Act "by discriminating and denying full and equal accommodations, advantages, facilities, privileges, goods, and services on the basis of gender." On that ground, the Commission ruled that the Elks and the Moose were in violation of "the public policy of this state" and that their restrictive membership practices were inconsistent with the purposes of the private club chapter of the Alcoholic Beverages Control Act and suspended their private club liquor licenses. There is no evidence that the Moose Lodges have discriminated in serving liquor to women or anyone else. The revocation of their licenses is based solely on the membership restrictions in the Moose Lodges. Accordingly, the Commission's actions fail to pass constitutional muster. This Court's identical treatment of the two lodges reflects a fundamental misunderstanding of First Amendment jurisprudence and the application of civil rights legislation.

The Moose and Elks lodges have numerous similarities. Both are nonprofit fraternal organizations; both are local units of national orders. The national organizations of the two units prohibit women from membership in their lodges but allow women to become members of auxiliary organizations. Women are deemed guests in the lodges and have access to the social quarters and can purchase liquor.

It is the differences between the two organizations, however, that determine their positions under the law. The Elks Lodges operate public restaurants, offer their facilities to the public for parties and other social activities, and carry on an extensive catering business. They have no limits on the number of male members allowed and actively recruit and encourage men to join. The Elks Lodges also conduct activities in which nonmembers are allowed to participate. Acknowledging these factors, this Court recently ruled that an Elk's Lodge was a place of public accommodation. *Beynon v. St. George–Dixie Lodge # 1743,* 854 P.2d 513 (Utah 1993). Thus, we held that it could not discriminate on the basis of gender because the lodge was a business enterprise regulated by the state and subject to the Utah Civil Rights Act. *Id.* at 519.

The Moose Lodges, on the other hand, are not places of public accommodation. They do not operate public restaurants and do not open their facilities to the public. Only members and prospective members are allowed inside their facilities. The Moose Lodges do not encourage nonmembers to participate in Moose Lodge activities. One becomes a member only by invitation. A nonmember guest must be a prospective member; the guest must sign a register and after the second visit must become a member or not be allowed inside the facilities thereafter. As the United States Supreme Court found, "[The] Moose Lodge is a private club in the ordinary meaning of that term," and it did not become an arm of the state or a state agency by virtue of the fact that it held a state liquor license and was subject to significant regulation in dispensing liquor. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 171, 92 S.Ct. 1965, 1970, 32 L.Ed.2d 627 (1972). I submit that on these facts, the Moose Lodges are entitled to the constitutionally protected right of free association, which the State of Utah may not infringe by denying them a liquor license. *See Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

The majority relies on *Beynon v. St. George–Dixie Lodge # 1743,* 854 P.2d 513 (Utah 1993), in rejecting both the Elks and the Moose Lodges' claims to a constitutionally protected right of association. The majority states, "This court has already held that a private club's liquor license may be suspended for discriminating against women without encroaching upon the club members' rights of association" (citing *Beynon* ). *Beynon* did not, however, address or even discuss the

issue of the suspension of a liquor license by the Commission. Rather, the issue was whether the St. George–Dixie Elks Lodge could deny the plaintiff, a woman, membership in the lodge on the basis of gender. The Court held in effect that since the Elks provided a place of public accommodation, they could be regulated by the state and were subject to the Utah Civil Rights Act. *Beynon,* 854 P.2d at 515.

In short, the majority's opinion is grounded in its misreading of our holding in *Beynon.* Citing *Beynon,* the majority asserts that a private association's constitutional right of free association is never infringed if it possesses a private club liquor license. That position is fundamentally at odds with the doctrine announced in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and is not supported by *Beynon. Beynon* explicitly avoided addressing the issue of the constitutional right of private associations to free association and its connection to the power of the state to regulate liquor: "We do not reach this issue because this case does not implicate the right to free association." *Beynon,* 854 P.2d at 518. Since the case presently before us does "implicate the right to free association," it is now necessary to examine the protection granted by the right to freedom of association and the effect that government licensure has on that right.

## I. FREEDOM OF ASSOCIATION

A basic principle underlying this nation's system of limited government and its social system is the principle that all persons have the right to be left alone, to be free from government interference in their private associations. That right to freedom of association is constitutionally protected under two rationales. *Board of Dir. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 544–45, 107 S.Ct. 1940, 1945–46, 95 L.Ed.2d 474 (1987); *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3249. First, the Constitution prohibits undue state interference with a person's choice to enter into and maintain various intimate human relationships, including membership in social organizations. *Rotary Club,* 481 U.S. at 544, 107 S.Ct. at 1945. Second, the Constitution protects associational protections to safeguard the exercise of First Amendment rights of expression. *Id.*

### A. Right to Social Interaction

The freedom to make personal bonds with others and to enter into social associations according to one's inclinations is essential to a free society. That freedom fosters diversity and acts as a critical buffer between the individual and the power of the state. *Roberts,* 468 U.S. at 619, 104 S.Ct. at 3250. "In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 618, 104 S.Ct. at 3249. Of course not all personal relationships implicate elements of personal liberty. *Id.* at 620, 104 S.Ct. at 3251. Determining the extent of state power to override personal choice in such matters "entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* Relevant factors include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.*

The fundamental right to define one's identity necessarily includes the right to associate with those of one's own choosing. *Roberts,* 468 U.S. at 617–18, 104 S.Ct. at 3249–50. In *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), the Court stated:

> This Court has repeatedly held that rights of association are within the ambit of the constitutional protections afforded by the First and Fourteenth Amendments.... "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."

372 U.S. at 543–44, 83 S.Ct. at 892–93 (citations omitted) (quoting *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958)).

The First and Fourteenth Amendments therefore guarantee a significant degree of individual autonomy in choosing those with whom one wishes to associate on a social basis. *See Roberts,* 468 U.S. at 618–19, 104 S.Ct. at 3249–50. In the private sphere, individuals have the freedom to pursue their own inclinations as to purely social relationships without having to submit to a state-imposed orthodoxy. As to an individual's autonomy in choosing social relationships, Justice William O. Douglas stated:

> The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires.

*Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 179–80, 92 S.Ct. 1965, 1974–75, 32 L.Ed.2d 627 (1972) (Douglas, J., dissenting on unrelated ground); *see also Bell v. Maryland,* 378 U.S. 226, 313, 84 S.Ct. 1814, 1862, 12 L.Ed.2d 822 (1964) (Goldberg, J., concurring) ("[I]t is the constitutional right of every person to close his home or club to any person. . . .").

Freedom of association protects more than the right to associate for political purposes. It protects the individual from the power of the state to compel unwanted associations not only in highly intimate relationships such as marriage, but also in less intimate relationships such as social groups. Human nature requires social relationships; and those relationships should be of one's own choosing, free of governmental compulsion or interference.

It is clear, of course, that the law does not tolerate customs or personal practices that discriminate against various groups by preventing them from freely participating in employment and from enjoying access to all public accommodations or essential public services. *E.g., Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Nevertheless, zeal in extirpating indefensible discrimination from public life ought not be allowed to swallow the right of individuals to associate in purely social relationships with those whom they will. Clearly there is some tension between the need to prevent discrimination in the public sphere and freedom of association in the private sphere, but that cannot justify granting unwarranted predominance to one value at the expense of the other.

In *Roberts,* the Court stated that prohibiting discrimination in the allocation of publicly available goods and services furthered a compelling state interest and that by limiting that prohibition to *public, quasi-commercial conduct,* such as that engaged in by the Jaycees, the state "abridge[d] no more speech or associational freedom than [was] necessary to accomplish that purpose." *Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 3256, 82 L.Ed.2d 462 (1984). Nevertheless, the Court reemphasized the limits on state power over expressive association in stating:

> *There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire.* Such a regulation may impair the ability of the original members to express only those views that brought them together. *Freedom of association therefore plainly presupposes a freedom not to associate.*

*Id.* at 622–23, 104 S.Ct. at 3252–53 (emphasis added).

*Roberts* thus holds that the characteristics of each association determine its associational freedoms. Although the record regarding those characteristics in this case is somewhat sparse because the Commission suspended the Moose and Elks Lodges' licenses solely on the basis of the lodges' bylaws, the available record facts all tend to support the conclusion that, according to *Roberts,* the Moose Lodges are private associations. Unlike the Jaycees and the Elks Lodges in this case, the Moose Lodges do not open their facilities or their activities to the public. Only members or first and second time prospective member guests are allowed inside the facilities. The Moose Lodges are selective in their membership and do not encourage nonmembers to participate. According-

ly, they have the constitutional right to associate with persons of their own choosing, and neither the state nor any regulatory agency has the power to impose membership restrictions on them; they can be as selective in their membership as they desire.

The majority claims that *Roberts* supports its position that the state may constitutionally impose its orthodoxy on private associations if they hold a liquor license. *Roberts* does not support that conclusion. *Roberts* held that the Jaycees, who excluded women from membership, was not an organization that had the characteristics of a private association and therefore was not entitled to a plenary right of free association. *Roberts*, 468 U.S. at 621, 623–29, 104 S.Ct. at 3251, 3252–56. In holding that no freedom of intimate association was implicated in that case, the Court stated:

> [T]he local chapters of the Jaycees are neither small nor selective. Moreover, much of the activity central to the formation and maintenance of the association involves the participation of strangers in that relationship. Accordingly, we conclude that the Jaycees chapters lack the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women.

*Id.* at 621, 104 S.Ct. at 3251.

Contrary to the majority's claim, *Roberts* did not focus on the size of the national organization. It was Justice O'Connor, in her opinion concurring in part and concurring in the judgment, who discussed the size of the national organization and stated that it was undeserving of associational rights. *Roberts*, 468 U.S. at 631, 104 S.Ct. at 3257 (O'Connor, J., concurring in part & in judgment). The majority of the *Roberts* Court expressly focused on the size of the "local chapters of the Jaycees." 468 U.S. at 621, 104 S.Ct. at 3251. The lack of selectivity of both the local chapters and the national organization was another important factor, as was the fact that nonmembers, both women and men, already "participate[d] in a substantial

portion of activities central to the decision of many members to associate with one another." *Id.*[1]

### B. Protection of Other First Amendment Activities

The second rationale supporting the right to freedom of association is the protection of the exercise of other First Amendment activities. *Board of Dir. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987); *Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Roberts*, 468 U.S. at 622, 104 S.Ct. at 3252. When a state attempts to interfere "with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association in both of its forms may be implicated." *Id.* at 618, 104 S.Ct. at 3249. I submit that freedom of association in both of its forms is implicated in this case with respect to the Moose Lodges.

### II. GOVERNMENT LICENSURE AND THE RIGHT OF FREE ASSOCIATION

The majority also argues that the highly regulated nature of liquor distribution in Utah warrants the state's infringement of the right of free association because by accepting a liquor license, the Moose voluntarily acquired a public status and their private associational characteristics are therefore irrelevant. That conclusion has been rejected by the United States Supreme Court.

The state's power to regulate liquor does not supersede all other provisions of the United States Constitution. The Twenty-first Amendment, which repealed Prohibition and granted states the power to regulate liquor, in essence created an exception to the normal operation of the Commerce Clause. *Craig v. Boren*, 429 U.S. 190, 205–06, 97 S.Ct.

---

1. There is nothing in *Roberts* that indicates, as the majority asserts, that "less-than-strict observance of club rules and bylaws" was a factor in determining the associational rights of the Jaycees. In short, it is difficult to see how that factor can be a "focus" of the Court's opinion or "another element that exposed the Jaycees to state regulation."

451, 461–62, 50 L.Ed.2d 397 (1976). That amendment was never intended to elevate state power to regulate liquor above rights guaranteed under the Constitution. *Id.; see also California v. LaRue,* 409 U.S. 109, 115, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972); *Celebrity Club Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1299 (Utah 1982).

> Once passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful. As one commentator has remarked: "Neither the text nor the history of the Twenty-first Amendment suggests that it qualifies individual rights protected by the Bill of Rights and the Fourteenth Amendment where the sale or use of liquor is concerned."

*Craig,* 429 U.S. at 206, 97 S.Ct. at 461 (quoting Paul Brest, *Processes of Constitutional Decisionmaking, Cases and Materials* 258 (1975)). Thus, notwithstanding its broad regulatory power over the importation, distribution, and sale of liquor, the state may not infringe other constitutionally protected rights without a compelling interest that arises out of the effects that liquor consumption may have on the public health, morals, and safety. *See California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (holding that a regulation prohibiting licensed bars or nightclubs from displaying, either live or on film, certain sexually explicit entertainment did not violate federal constitution).

In *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), the Court held that a state liquor license did not transform a private association that held such a license, a Moose Lodge, into a public or state entity, thereby empowering the state to ban the lodge's discriminatory practices. Like the statutory scheme in Utah, the statutes in *Moose Lodge* that governed the sale of liquor imposed "pervasive" regulation with respect to private clubs that had liquor licenses and limited the maximum number of licenses available to private clubs. Notwithstanding the pervasive regulation, the Court stated:

> [We have] never held, of course, *that discrimination by an otherwise private entity* would be violative of the Equal Protection Clause *if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever.*
>
> . . . .
>
> ... However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise.

*Id.* at 173, 176–77, 92 S.Ct. at 1971, 1973–74 (emphasis added). In short, the recipient of a state liquor license does not lose its status as a private entity and become an arm of the state by virtue of the license.

Notwithstanding the state's interest in eliminating discrimination in publicly offered accommodations, goods, and services, including the disbursement of liquor, the state has no legitimate interest in overriding associational rights with respect to private organizations. *Beynon* did not hold that the Utah Civil Rights Act applied to all private club liquor licensees regardless of the nature of the private association and the right of its members to freedom of association. That issue simply was not before the Court. If the Legislature had attempted to make that Act apply to all associations, it would have violated the constitutional right to associational freedom of groups that were truly private.

The majority asserts that *Jones v. Mayer,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), and *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), stand for the proposition that when private individuals enter the public marketplace or work place they are transformed into publicly regulated entities. Therefore, the majority argues, because the Moose Lodges are "in the public sphere and in the stream of commerce, they

voluntarily surrendered the rights they had in their private lives to discriminate."

The majority misconstrues those cases; they do not stand for the proposition that all entities in the "public sphere" surrender their right to freedom of association. In *Katzenbach, Heart of Atlanta*, and *Guest*, the Court held that businesses that provided public accommodations could not discriminate on the basis of race.[2] In *Jones*, the issue before the Court was whether Congress had power under the Thirteenth Amendment to prohibit private individuals from refusing to sell or rent real property on the basis of race. The Court held that the Amendment empowered Congress to secure for all citizens the right to inherit, purchase, lease, sell, and convey property. These rights were fundamental to the "maintenance of freedom. . . . A man who enjoys the civil rights mentioned in [42 U.S.C. § 1982] cannot be reduced to slavery." 392 U.S. at 443–44, 88 S.Ct. at 2205–06. Again, the case involved a situation in which a private individual, while opening up a service or a sale to the public, attempted to discriminate on the basis of race. Of course, a private individual or privately owned business that offers service to the public may be prohibited from discriminating. It does not follow that a private association that does not open itself to the public and exists only to provide congenial social relationships can be denied the right to be selective in its membership criteria.

The majority also argues that allowing private groups that sell liquor to discriminate lessens the availability of liquor over the counter to certain classes, such as minorities and women, and could result in the total exclusion of such groups from important business opportunities. The argument is untenable. Indeed, just such an argument was rejected in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972). There is absolutely no evidence in this case that there is any impediment to

minorities in obtaining liquor. The majority simply conjures the abstract possibility of such a problem. The limited number of available private liquor club licenses falls far short of conferring on private associations anything like a monopoly in dispensing over-the-counter liquor in Utah. Furthermore, but for today's decision, any group of people could apply for a private liquor club license. The Act provides for restaurant liquor licenses in numbers greater than private liquor licenses for the "storage, sale, and consumption of liquor on premises operated as public restaurants." Utah Code Ann. § 32A–4–101. Restaurant liquor licensees are subject to substantially the same operational restrictions as those imposed on private club liquor licensees. *Cf.* Utah Code Ann. §§ 32A–4–206, 32A–5–107. Nothing prohibits any group or class of persons from entertaining business clients and personal friends in these establishments or denies them important social opportunities that accompany the regulated sale and consumption of liquor.

The majority further asserts that its "decision does not impose an unconstitutional condition upon the Elks or the Moose" because they *"voluntarily* surrendered" their private status by accepting a liquor license, and thus because its ruling "affects only that portion of petitioners' activities that are in the public sphere, it does not impinge upon the right to free association, a private right." (Emphasis in original.) This analysis begs the following question: Does the regulatory scheme impose the condition of giving up the constitutional rights of freedom of association for the receipt of a benefit from the state?

Allowing a state to bestow benefits only on those willing to forego a constitutional right can be fundamentally destructive of our constitutional fabric. The Constitution was designed to protect those who wish to exercise their constitutional rights, even in ways contrary to the will of the majority. Except in

---

2. The majority relies on *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), to support its assertion that conditioning the Moose Lodges' receipt of a liquor license on its compliance with the Civil Rights Act is not unconstitutional. *Katzenbach* does not support this position. In *Katzenbach,* the owners of a public restaurant brought an action challenging

the constitutionality of Title II of the Civil Rights Act of 1964, as applied to restaurants. The Court upheld the constitutionality of the Act on the basis of Congress' power under the Commerce Clause. There was no issue as to the restaurant owner's associational freedoms or as to an unconstitutional condition on the bestowal of a government privilege.

unusual circumstances, benefits or privileges cannot be granted on condition that a person surrender a constitutional right. Although a state may deny benefits or privileges for a number of reasons, "[i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (invalidating unconstitutional condition in public employment); *see Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (in welfare payments); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (in public employment); *Sherbert v. Verner,* 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963) (in unemployment compensation); *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (in tax exemption); *Frost & Frost Trucking Co. v. Railroad Comm'n,* 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926) (in public highway access). "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. *This would allow the government to 'produce a result which [it] could not command directly.'* " *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697 (emphasis added) (quoting *Speiser,* 357 U.S. at 526, 78 S.Ct. at 1342); *see Sherbert,* 374 U.S. at 405, 83 S.Ct. at 1795 ("[C]onditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms.").

The heart of the doctrine of unconstitutional conditions denies the government the power to grant a privilege on condition of surrendering a constitutional right, except in exceptional circumstances. In *Frost,* the Court explained:

> If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.

*Frost,* 271 U.S. at 593–94, 46 S.Ct. at 607 (emphasis added).

I submit that the state has no legitimate interest in dictating the membership practices of private associations in general, or the Moose Lodges in particular. Contrary to the majority's assertion, it is firmly established that private associations do not lose their private status and become instrumentalities of the state merely because they receive a license from the state. *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); *see also Kiwanis Int'l v. Ridgewood Kiwanis Club,* 806 F.2d 468, 472, 477–78 (3d Cir.1986) (private club had right to enforce discriminatory trademark licensing agreement with local club regarding four Kiwanis service marks). *Kiwanis Club of Great Neck, Inc. v. Board of Trustees of Kiwanis Int'l,* 83 Misc.2d 1075, 374 N.Y.S.2d 265, 268–69 (N.Y.Sup.Ct.1975) (private club had right to discriminate in its membership, even though it received a tax exemption). As *Roberts* made clear, it is the characteristics of the association which dictate whether it is subject to laws regarding public accommodations. *Roberts,* 468 U.S. at 618–20, 104 S.Ct. at 3249–51.

The majority's decision, simply put, attempts to regulate that which the state has no power to regulate directly. It accomplishes this by granting a state-conferred privilege on condition that a constitutional right is relinquished. The majority states that by accepting a liquor license, private associations perform a "quasi-public" service and become public for purposes of the Civil Rights Act. They are free to remain "private" and not subject themselves to the state's membership criteria as long as they forego a liquor license, but they may not receive a liquor license and retain their right to freedom of association.

That rationale, I submit, would justify a host of unconstitutional state intrusions on individual rights. Such intrusions cannot be supported on the premise that the state can regulate that which it otherwise has no power to regulate so long as the recipient of a state "privilege" "voluntarily" relinquishes a constitutional right which the state seeks to defeat. This Court ought not, in my view,

endorse such state paternalism in the granting of "privileges" on condition of yielding a right.

I submit the Commission erred in determining that the Moose Lodges violated the Civil Rights Act. I would reverse the Commission's decision suspending the private club liquor licenses of the Moose Lodges.

RUSSON, J., concurs in Associate Chief Justice STEWART's opinion.